IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
Indianapolis Division

| | |
|---|---|
| McMILLAN McGEE CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: 1:21-cv-1988 |
| v. ) | |
| ) | |
| THIRD SITE TRUST FUND, ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT FOR DAMAGES AND IMMEDIATE POSSESSION OF PERSONAL PROPERTY, AND REQUEST FOR JURY TRIAL**

### I.   PARTIES, VENUE, & JURISDICTION

1. The Plaintiff, McMillan McGee Corp. ("Mc2") is a Canadian corporation domiciled in Calgary, Alberta.

2. The Defendant, the Third Site Trust Fund (the "Trust") is a trust established pursuant to the laws of the State of New York and pursuant to Administrative Order by Consent, docket V-W-02C-698.

3. The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4. Jurisdiction in this Court is proper pursuant to 28 U.S.C. 1332(a)(2).

5. Diversity jurisdiction exists because (a) there is complete diversity of citizenship between Mc2 and the Trust; and (b) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

### II.   BACKGROUND

6. Mc2 is an environmental remediation company domiciled in Calgary, Alberta, Canada, and conducting business worldwide.

7. This action relates to remediation work performed by Mc2 at the Third Site, a Superfund Site near Zionsville, Indiana (the "Site").

8. On May 11, 2001 the United States Environmental Protection Agency ("EPA") issued an Enforcement Action Memorandum ("EAM") detailing that removal actions were necessary

        to address the threats posed by the presence of Volatile Organic Compounds ("VOCs") and dense non-aqueous phase liquids ("DNAPLs") at the Site. The minimum cleanup requirements pursuant to the EAM included a 90% reduction in VOCs within the DNAPL area.

9. Under an Administrative Order on Consent signed on or about November 21, 2002 (the "Consent Order") by a number of Potentially Responsible Parties ("PRPs"), the PRPs introduced a plan to implement the removal actions identified in the EAM. Part of this treatment plan included attempting to contain the DNAPL Area by enclosing the area laterally with a sheet pile wall.

10. On December 12, 2016, the EPA issued an Amended Enforcement Action Memorandum (the "Amended EAM") approving a change in scope for the remediation of the Site to add Electrical Resistance Heating ("ERH") to treat the affected areas. ERH is an *in-situ* treatment process that applies electrical current to the contaminated zone to generate heat near or above the boiling points of the targeted chemicals. The chemicals are vaporized and then a vapor extraction system removes them from the Site.

### III. THE CONTRACT

11. Mc2 was contracted to provide ERH Treatment at the Site pursuant to a Contract dated October 3, 2016 between Mc2 and the Trust (the "Contract"). A copy of the Contract is attached hereto as **Exhibit A.**

12. Specifically, pursuant to §1.1.1 of the Contract, Mc2 was contracted to design, install, operate and maintain an ERH system to reduce the concentration of VOCs by greater than 90% in the sheet pile enclosed defined DNAPL Area to a depth of 40 feet and in the defined Additional Thermal Treatment Zone (the "ATT zone"), (the "Contract Goal" or the "Remediation Goal")

13. The relevant sections of the Contract attached hereto as **Exhibit A** indicate as follows:

    *1.1    Scope – Contractor shall perform and complete on time the Work provided for in this Contract at Third Site, a Superfund Site located in Boon County, Indiana (the "Site"). The Site is subject to an Environ 2004 Design approved by EPA so as to achieve certification by EPA that the removal Action ("RA") cleanup levels as defined in the Consent Order and the Enforcement Action Memorandum ("EAM") referenced herein, have been fully achieved (not including the cleanup levels to be achieved through long-term monitored natural attenuation). The Environ 2004 Design presently includes the implementation of chemical oxidation in a sheet pile enclosed DNAPL area ("the DNAPL area"). The Trustee have requested that EPA approve the substitution of ERH to achieve the required cleanup levels in the DNAPL area and also to allow its use in the small Additional Thermal*

*Treatment Zone (the "ATT zone") adjacent to and just outside of the DNAPL area. Assuming that such final approval is received, the Work includes the following:*

1.1.1 *Preparation of a Remedial Action Work Plan ("Work Plan") for submission to EPA of the design, installation, operation and maintenance of an ERH system at Third Site to achieve a reduction in the concentration of total volatile organic compounds ("VOCs") in groundwater in the Third Site DNAPL area to a depth of forty (40) feet and in the small ATT zone outside the sheet pile wall, by greater than 90% at both locations;*

1.1.5 *Following final approval of the ERH system design by EPA (the "Final ERH Design Package"), design, install, and O&M an ERH system in accordance with the Final ERH Design Package to achieve a reduction in the concentration of total VOCs in groundwater in the Third Site DNAPL area and in the small ATT zone outside the sheet pile wall, by greater than 90% at both locations;*

4.2 *Contractor shall be solely responsible for the means, methods, techniques, sequences, procedures of construction and safety at the Site that implement the requirements of the Contract Documents.*

7.1 *Explorations And Reports — Reference is made to the background information distributed with the Invitation to Prequalify for this Contract that may have been utilized in the preparation of the Contract Documents. The background information is for general information purposes only and the Trust does not guarantee the background information, except that the Contractor may rely (a) upon the accuracy but not the completeness of the technical data and dimensions that are contained in drawings prepared by Environ or Ramboll Environ (except that depth of treatment shall be to forty (40) feet), (b) the information regarding Grain Size Distribution and Additional Soil Data provided to the Contractor in an e-mail from the Trust dated March 11, 2016, and (c) the Technical Memorandum provided by Ramboll Environ as to Soil Resistivity Testing and other matters (except as to any assumed depth of treatment) dated April 5, 2016. Except as indicated in the immediately preceding sentence and in Section 7.2 or 7.3, Contractor shall have full responsibility with respect to the physical conditions at or relating to the Site including surface, subsurface and other existing conditions.*

7.2 *Differing Conditions Resulting from Inaccurate Data — If Contractor believes that (a) there is an error in the items on which it is entitled to rely under Section 7.1, or (b) there is a "fundamental difference" as set forth in Section 7.2A, Contractor shall, within five (5) business days after becoming aware of (a) or (b) and before performing any further Work in connection therewith, notify the Trust and the Trust's Engineer in writing about the*

3

> *error or fundamental difference of the type referred to in (a) or (b) and the consequences of the error or fundamental difference. The Contractor shall follow the Trust's directives and shall be entitled, if appropriate, to an equitable adjustment in the Contract Price. There shall be no adjustment in the Contract Time for such differing site conditions except that the Contract Time shall be increased to the extent a time extension is received under the Consent Order. If no such time extension is granted, the equitable adjustment shall compensate the Contractor for reasonable acceleration costs necessary to overcome the delay caused by such error or errors.*
>
> *7.2A   Fundamental Difference - The term "fundamental difference" for purposes of this Contract shall mean only a difference that causes EPA, after it has approved the use of ERH for the DNAPL area and the ATT zone and issued an Amendment to the EAM and/or issued an Explanation of Significant Differences ("ESD") with respect to that change, to issue a subsequent ESD or an Amendment to the EAM that alters the conditions or obligations applicable to the DNAPL area or the ATT zone. In the event of such subsequent ESD or subsequent Amendment to the EAM, the Trustees will either provide an equitable adjustment reasonably acceptable to Contractor or terminate the Contractor for convenience.*

14. In accordance with the terms of the Contract, Mc2's Technical and Cost Proposal dated August 15, 2016 was submitted to the Trust on August 15, 2016 (the "Design Proposal"). The Design Proposal, attached hereto as **Exhibit B**, noted:

    > *3.2.1(8):   Mc2 will not be held responsible for contamination of the treatment zone due to migration of pre-existing COCs from outside of the treatment zone.*

15. The Design Proposal outlined that Mc2's ERH system relied on inward pneumatic and hydraulic gradients. As a result, the contamination had to be properly delineated so as not to draw in outside contaminants.

16. As well, Engineering Certification stated, "If conditions are discovered that differ from those described, the undersigned engineer should be notified to evaluate the effects of any additional information on the assessment and recommendations in this document."

### IV.   THE PROJECT

17. After approval by the EPA and the Trust of the Design Proposal, Mc2 began operating its ERH system on September 24, 2018.

18. Mc2's ERH system was operated as designed, with the desired effect of heating DNAPL Area to a depth of forty (40) feet below ground surface (BGS).

19. The extraction and treatment system operated at the design capacity throughout the project, and the average site temperature exceeded 88°C for a period of 83 consecutive days during operations (November 7th 2018 to Jan 30th 2019).

20. The system achieved a net extraction in excess of 2300 pounds of contaminants.

21. Testing conducted January 30, 2019 revealed that VOCs were 210 μg/L; a full Order of magnitude lower than the Contract Goal.

22. Testing conducted on March 29, 2019, however, unexpectedly revealed a "rebounding effect" or "recontamination" whereby the level of VOCs in two of the wells (P-1 and MW-27R) had increased to above the Contract Goal.

23. Well P-2 also showed an increase above the Contract Goal, but this increase was of contaminants that were not part of the accepted contaminant list that Mc2 had agreed to remediate (as discussed in more detail below).

24. Well P-2 met the Contract Goal based on the original nine-contaminant list, as had been outlined in the Design Proposal, and accepted by the Trust (the "Contracted VOCs").

25. As a result of this recontamination or rebounding effect, Mc2 restarted its ERH System on April 22, 2019, which operated until July 5, 2019.

26. $Mc^2$ tested groundwater in wells P-1 and P-2 on June 28 and August 2, 2019, respectively, and the results indicated that concentrations were again more than an order of magnitude below the Contract Goal for both wells.

27. On September 5, 2019, however, further sampling from wells P-1 and P-2 was conducted and again revealed that a recontamination or rebounding effect had occurred in P-1.

28. This recontamination or rebounding effect in P-1 was unexpected because contaminant rebound or recontamination is not associated with thermal remediation.

29. In a site with poorly defined zones of contamination, however, a recontamination or rebounding effect may occur as a result of mass flux from outlying contaminated areas.

30. As a result of the recontamination or rebounding effect observed in September 2019, Mc2 believed that there a mass of contamination located outside the treatment area, which was communicated to the Trust on multiple occasions.

31. On November 12, 2019, Mc2 advised the Trust in writing that it believed a contaminant mass below the DNAPL Area was causing the recontamination and advised the Trust that it considered this to be a fundamental difference within the meaning of the Contract.

32. On November 14, 2019, the Trust advised Mc2 in writing that it was considering declaring a Contractor Default and that Mc2's ERH system was Defective within the meaning of the Contract.

33. In the November 14, 2019 communique, the Trust demanded immediate repayment of $2,409,000.44 as well any losses and damages incurred by the Trust as a result of Mc2's alleged failure to meet the Contract Goal.

34. $Mc^2$ restarted thermal operations in the vicinity of well P-1 on November 27, 2019.

35. Following multiple exchanges of correspondence and conference calls with the Trust, Mc2 forwarded a sampling plan to the Trust on November 29, 2019.

36. The November 29, 2019 sampling plan would have permitted the parties to determine where the further contamination was coming from.

37. At the request/demand from the Trust, Mc2's sampling plan was revised and resubmitted on December 11, 2019.

38. On January 7, 2020, the Trust rejected the December 11, 2019 revised sampling plan as well.

39. Mc2 submitted a third sampling plan on January 10, 2020.

40. $Mc^2$ ceased thermal operations in the vicinity of well P-1 at the direction of the Trust on January 16, 2020.

41. The January 10, 2020 sampling plan was also rejected by the Trust on January 17, 2020.

42. At that time, the Trust advised that it was retaining its own geotechnical consultants, Ramboll Environ ("Ramboll") and Geosyntec Consultants International Inc. ("Geosyntec") to provide sampling plans instead.

43. The Trust proceeded to submit a new sampling plan from Geosyntec to the EPA on February 10, 2020.

44. On February 21, 2020, Mc2 provided comments to the EPA and the Trust regarding Geosyntec's February 10, 2020 sampling plan.

45. On or about February 21, 2020, Mc2 also asked the EPA whether Mc2 would be permitted to conduct its own sampling at the Site.

46. The EPA advised on May 6, 2020 that it did not have any objections to Mc2 performing the further sampling it was requesting.

47. On May 21, 2020, the Trust refused to allow Mc2 access to the Site for the purpose of conducting this further sampling.

48. On July 27, 2020, Mc2 advised the EPA what further testing Mc2 believed was necessary.

49. The EPA agreed with Mc2 that this further testing should be conducted, as proposed by Mc2.

6

50. The Trust, notwithstanding the EPA's direction, continued its refusal to allow Mc2 to conduct any sampling without an "Access Agreement."

51. The Parties executed an Access Agreement on or about July 30, 2020.

52. Further testing was conducted from July 21 to August 13, 2020.

53. This testing revealed VOCs significantly in excess of the Contract Goal at 41 to 46 feet below ground surface (BGS) in groundwater samples, at concentrations indicative of the presence of DNAPL. Soil samples from the 41- to 46-foot BGS range had VOCs concentrations as high as thirty-nine times those from 0 to 40 feet BGS, exclusive of 1,2-DCB, defined below.

54. Further, contaminant concentrations from groundwater samples collected immediately below the DNAPL Area also exceeded the Contract Goal.

## V.    FUNDAMENTAL CHANGE TO THE CONTRACT

55. Full and accurate delineation of the extent of contamination, prior to commencement of thermal remediation, is critical to ensure that the heated soil volume will encompass soil and groundwater with unacceptably high contamination levels.

56. The DNAPL Site as defined in the Contract was to a depth of 40 feet.

57. Outside mass was found at depths of 41-46 feet BGS.

58. In order to properly remediate an area using thermal remediation, it is imperative that the area be properly delineated.

59. It was evident from these sampling results that the original Site delineation was incorrect.

60. Accordingly, the desired remediation could not be achieved.

61. Mc2 advised the Trust in writing on November 12, 2019 that this outside contamination was a fundamental difference within the meaning of clause 7.2 of the Contract that would require an adjustment to the Contract Price.

62. Mc2 further advised that Clauses 7.1 and 7.2 of the Contract stipulate that where site conditions differ from what was distributed in the Invitation to Prequalify for the Contract, there may be an adjustment to the Contract Price.

63. This stipulation regarding outside contamination was reiterated at clause 3.2.1 (8) of Mc2's Design Proposal in which Mc2 noted specifically that (1) it would not be held responsible for any contaminants outside of the treatment zone and (2) any additional decontamination required due to such contaminants would require a Change Order.

64. This communication from Mc2 was met with a demand from the Trust for immediate repayment of $2,409,000.44 as well any losses and damages incurred by the Trust as a result of Mc2's alleged failure to meet the Contract Goal.

65. Sampling conducted in July and August 2020 confirmed the contamination below the DNAPL Area.

66. Mc2 has advised the Trust that this lower contamination requires further thermal remediation.

67. On June 2, 2021, the EPA also advised that it would be preferable that further thermal remediation be used to remove these lower contaminants and that bioremediation would be more appropriately considered <u>after</u> further thermal remediation.

68. The Trust, however, has chosen to proceed with bioremediation instead, and purportedly terminated the Contract on June 1, 2021.

## VI.    REFUSAL TO ALLOW Mc2 TO REMOVE EQUIPMENT WITHOUT ANY CONTRACTUAL OR OTHER AUTHORITY

69. On November 12, 2019, Mc2 advised the Trust in writing that the remaining treatment areas were localized to the area around P1 and did not require all of Mc2's equipment to remain on Site.

70. Mc2 further advised that much of its equipment could be removed as it was no longer necessary and that any future soil vapor and groundwater treatment could be performed using a skid-mounted vacuum blower, vacuum lift pump, and activated carbon treatment system. This would provide much better well field access, and would eliminate a large amount of grossly overcapacity equipment, which was no longer required.

71. The Trust's response to this correspondence was to hire security to ensure that Mc2 was unable to remove its equipment.

72. The Trust has failed to exercise due care in maintaining the property or the equipment.

73. There is no contractual or other right of the Trust to withhold this equipment.

74. Mc2 has incurred damages and will continue to incur damages as a result of the Trust withholding this equipment and failing to exercise due care in maintaining same while impounding it.

## VII.    1, 2 – DICHLOROBENZENE ("1,2-DCB")

75. The Trust alleges that Mc2 did not meet the Contract Goal 1,2-DCB should be included as one of the VOC's that Mc2 was required to remediate.

76. 1,2-DCB is a semi volatile organic compound (SVOC) that may not be successfully remediated by ERH due to its high boiling point, high water co-boiling temperature (97.8°C), and low corresponding vapor pressure at this temperature.

77. The Trust's Request for Proposal for the ERH project included the water data which indicated the VOCs that were being targeted at the Site. 1,2-DCB is not one of the chemicals that is listed.

78. The Contract between the Third Site Trust and Mc2 does not include any definition of volatile organic compounds or VOCs in Article 18, Definitions, or in any other portion of the Contract.

79. The Contract incorporates the following relevant technical documents:

    (a) The Consent Order including the EAM;

    (b) The Environ 2004 Design Report for Non Time-Critical Removal Action at Third Site, Second Revision; and,

80. The Consent Order, attached hereto as **Exhibit C,** states:

    *Six VOCs were identified as the contaminants of concern based on historic and recent sampling at the site. The following compounds were found in site soil and groundwater: tetrachloroethene (PCE), trichloroethene (TCE), cis-1,2 dichloroethene (cis-1,2 DCE), vinyl chloride, Trans-1,2 dichloroethene (Trans-1,2 DCE), and 1,1-Dichloroethene.*

    **Exhibit C**, ¶6, p. 5,

81. The Consent Order does not list 1,2-DCB in the contaminants of concern.

82. The Enforcement Action Memorandum, attached hereto as **Exhibit D**, states:

    *VOCs identified as the contaminants of concern based on their occurrence in soil (measured in ug/kg) and/or groundwater (measured in ug/l), and their maximum concentrations are as follows: tetrachloroethene (330,000 ug/kg, 36 ugh); trichloroethene (350,000 ug/kg, 870 ug/l); cis-1,2-dichloroethene (130,000 ug/kg, 29,000 ug/l); vinyl chloride (4,800 ug/kg, 860 ug/l); trans-1,2-dichloroethene (930 ug/kg, 100 ug/l); 1,1,1-trichloroethane (49,000 ug/kg, 5,800 ug/l); 1,1,2-trichloroethane (ND,12 ug/l); 1,1-dichloroethane (23,000 ug/kg, 780 ug/l); and 1,1-dichloroethene (100 ug/kg, 160 ug/l)."*

    **Exhibit D**, p. 4

83. The EAM does not mention 1,2-DCB.

84. The 2004 Environ Design Report for Non Time-Critical Removal Action at Third Site, Second Revision includes the same nine contaminants of concern identified in the EAM.

85. Nowhere in the text of the 2004 Environ Design Report does 1,2-DCB appear.

86. Further, Mc2's Design Proposal lists the same nine contaminants of concern (tetrachloroethene, trichloroethene, cis-1,2-dichloroethene, vinyl chloride, trans-1,2-dichloroethene, 1,1,1,-trichloroethane, 1,1,2-trichloroethane, 1,1-dichloroethane, and 1,1-dichloroethene) in Table 4.

87. Mc2's Design Proposal explicitly excludes 1,2-DCB.

88. The Design Proposal was accepted by the Trust and the EPA.

89. The contaminants of concern to be included in the Contract did not include 1,2-DCB.

90. VOC concentrations must be calculated with 1,2-DCB omitted.

## COUNT 1: BREACH OF CONTRACT/FUNDAMENTAL CHANGE

91. Plaintiff incorporates by reference the material factual allegations contained in paragraphs 1-90, *supra*, as though fully stated herein.

92. On October 20, 2020, following confirmation of the outside contamination, Mc2 asked the EPA for an Amended Enforcement Action Memorandum that altered the conditions or obligations applicable to the site DNAPL area, in accordance with the Contract, so Mc2 would be compensated for the fundamental changes in known conditions.

93. Mc2 was and continues to be motivated to remediate the Site, which it has now confirmed includes contaminant mass below the Treatment Zone.

94. The Trust has refused to permit Mc2 to finish the remediation.

95. Mc2 fully and completely fulfilled all of its obligations under the Contract with the exception of demobilizing its equipment.

96. The Trust has prevented Mc2 from demobilizing its equipment.

97. Mc2 provided services in accordance with the Contract and surpassed the Contract Goal.

98. The Trust has breached the Contract by failing to properly delineate the Site in the first instance and also frustrated the Contract by refusing to allow Mc2 to address the contamination outside the DNAPL Area.

99. Mc2 has performed all of its obligations under the Contract.

## COUNT 2: CONVERSION

100. Plaintiff incorporates by reference the material factual allegations contained in paragraphs 1-99, *supra*, as though fully stated herein.

101. Further, the Trust has breached its obligations under the Contract by failing to allow Mc2 to remove its equipment from the Site and by improperly withholding the equipment without any contractual or other right to do so, thereby converting the equipment to its own use.

102. Notwithstanding its requests to be permitted to remove its equipment, the Trust has not only refused but actively prevented Mc2 from doing so.

103. A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion.

104. As a result of the Trust's conversion, Mc2 has sustained actual damages exceeding $3,000,000, as outlined in more particularity below.

105. Mc2 seeks damages for civil and criminal conversion.

106. The Trust has acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence, or other human failing.

107. As a result of its malicious, fraudulent, and oppressive behavior and actions, the Trust should be punished and subjected to punitive damages for the purpose of preventing it and others situated from engaging in the same or similar conduct in the future.

108. To the extent not duplicative with a recovery of punitive damages, pursuant to Ind. Code §34-24-3-1, Mc2 seeks three times the actual damages suffered as a result of the Trust's conversion, the costs of this action, reasonable attorney's fees, and all other damages recoverable under I.C. §34-24-3-1 *et seq.*

## COUNT 3: UNJUST ENRICHMENT

109. Plaintiff incorporates by reference the material factual allegations contained in paragraphs 1-108, *supra*, as though fully stated herein.

110. In the alternative, the Trust has been unjustly enriched by its failure to pay for work carried out by Mc2 for the benefit of the Trust.

111. As a result of the recontamination or rebounding effect that occurred at the Site, through no fault of Mc2, Mc2 conducted further remediation at the Site from April to August 2019, and again from November 2019 to January 2020, entirely at its own cost.

112. The Trust received a benefit from these expenditures and services.

113. Mc2 has been correspondingly deprived.

114. There is no juristic reason to permit Third Site to be enriched in this manner.

115. Mc2 claims damages for unjust enrichments for these extended operations, as outlined in more detail below.

116. Alternatively, Mc2 seeks damages for unjust enrichment on a *quantum meruit* basis.

### COUNT 4: IMMEDIATE POSSESSION PURSUANT TO I.C. §32-35-2-1 *ET SEQ.*

117. Plaintiff incorporates by reference the material factual allegations contained in paragraphs 1-116, *supra*, as though fully stated herein.

118. Plaintiff's personal property is being held at the site of the project by Defendant.

119. Plaintiff's personal property is being wrongfully detained by Defendant.

120. Defendant refuses to provide justification for such wrongful detention of Plaintiff's personal property.

121. Plaintiff's equipment contains highly corrosive chemicals that are not suited to sit idle for two years.

122. Plaintiff experiences irreparable harm and will continue to suffer and experience said harm daily, as a direct and proximate result of the actions and inactions of Defendant, including wrongfully detaining said property.

123. Plaintiff is entitled to immediate possession of such personal property.

### VIII.   DAMAGES:

124. Mc2 continues to accrue damages as a result of the Trust's refusal to allow Mc2 to remove its equipment from the Site.

125. As a result of the Trust's actions as described above, Mc2 has suffered damages as follows:

    (a)   Minor Subcontractor Costs           $60,396.74

    (b)   MK Environmental Continued Costs    $1,750,486.41

    (c)   Sampling/Waste Costs                $16,321.14

    (d)   Rental Costs                        $130,734.66

    (e)   Energy Costs                        $75,588.70

    (f)   Shipping Costs                      $3,379.57

| | | |
|---|---|---|
| (g) | Extended Operations/Other Costs | $6,302.04 |
| (h) | Legal Costs | $10,213.03 |
| (i) | Labor Costs | $154,199.27 |
| (j) | Travel Costs | $10,301.51 |
| (k) | Mc2 Equipment Costs | $800,280.00 |
| | **TOTAL:** | **$3,018,203.07** |

126. Mc2 reserves its right to amend its claim to include additional damages, including but not limited to losses for damaged equipment or other harm that may have been caused by the Trust's refusal to allow Mc2 to remove is equipment and its conversion of same to Mc2's detriment.

127. Mc2, pursuant to Fed. R. Civ. P. 38(b), demands that this matter be tried to a jury on all issues so triable.

WHEREFORE, Mc2 seeks immediate possession of all personal property rightfully belonging to Plaintiff that is being wrongfully detained; judgment for damages for breach of contract in the amount of US$3,018,203.07 in addition to amounts that continue to accrue until Mc2 is permitted to remove its equipment from the Site; pre-judgment interest in the amount of 10% per annum accruing from the earliest allowable time; post-judgment interest in the amount of 8% per annum or otherwise allowed pursuant to 28 U.S.C. §1961; treble damages, attorney fees, and all other damages allowed pursuant to I.C. §34-24-3-1; punitive damages to the extent not duplicative of damages recoverable under I.C. §34-24-3-1 in an amount sufficient to deter the Trust and others similarly situated from engaging in the same or similar conduct; for the costs of this action; and for all other relief just under the premises.

Respectfully Submitted,

_____

Charles J. Maiers, #31408-49
Christopher J. Appel, #30980-49

DUE DOYLE FANNING & ALDERFER, LLP
8440 Allison Pointe Blvd., Ste. 350
Indianapolis, IN 46250
317-635-7700
cmaiers@duedoyle.com
cappel@duedoyle.com

13