UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MCMILLAN MCGEE CORP., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:21-cv-01988-TWP-MJD |
| | ) |
| THIRD SITE TRUST FUND, | ) |
| | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

This matter is before the Court on Plaintiff McMillan McGee Corp.'s Motion for Immediate Possession of Personal Property. [Dkt. 7.] On August 27, 2021, District Judge Tanya Walton Pratt designated the undersigned Magistrate Judge to issue a Report and Recommendation regarding the disposition of the motion pursuant to 18 U.S.C. § 636(b)(1)(B). [Dkt. 22.] For the reasons set forth below, the Magistrate Judge recommends that Plaintiff's motion be **DENIED**.

Additionally, there are two collateral motions related to Plaintiff's motion that require resolution. Defendant Third Site Trust Fund's Motion to Strike the Affidavit of D. Brent Winder, [Dkt. 15], is **DENIED AS MOOT**, in light of Plaintiff's filing of the Amended Affidavit of D. Brent Winder on August 10, 2021. [Dkt. 16-1.] Defendant's Motion for Leave to File Surreply, [Dkt. 17], is **GRANTED**, and the Court has considered Defendant's Surreply, [Dkt. 17-1], in making the instant Report and Recommendation.

1

## I. Background

At the heart of this replevin action is a contract dispute. Plaintiff is an environmental remediation company domiciled in Calgary, Alberta, Canada. [Dkt. 1 at 1.] Defendant is a trust created by the U.S. Environmental Protection Agency ("EPA") to fund the cleanup of "Third Site," a tract of land located near Zionsville, Indiana. [Dkt. 14 at 2.] The two trustees are Norman Bernstein and Peter Racher. Contract § 18.1.25 [Dkt. 14-2 at 31].[1] All environmental remediation efforts at Third Site are done pursuant to the oversight and approval of the EPA and are subject to EPA Consent Orders. [Dkt. 14 at 2.]

In May 2001, the EPA issued an Enforcement Action Memorandum, documenting "the determination of an imminent and substantial threat to public health and the environment" at Third Site and describing "the removal actions necessary to address the threats posed by the presence of soil and groundwater contaminated with" volatile organic compounds ("VOCs") and dense non-aqueous phase liquids ("DNAPLs"). [Dkt. 14-7 at 10.] The EPA then issued an Amended Enforcement Action Memorandum in December 2016 that approved the supplemental application of Electrical Resistance Heating ("ERH") to Third Site in order to reduce the threat of VOCs. [Dkt. 14-7.]

> ERH is an in-situ treatment process that applies electrical current to the saturated and unsaturated contaminated zone using a network of electrodes and natural electrical resistance within the subsurface to generate heat near or above the boiling points of the targeted chemicals. As a result, chemicals transition to the vapor phase and are stripped from the soils or degraded. A vapor extraction system then removes volatile chemicals for treatment at ground surface.

[Dkt. 14-7 at 1-2.] The Amended Enforcement Action Memorandum provided the following:

---

[1] Plaintiff is reminded of Local Rule 5-6(a)(2), which requires that each electronically filed exhibit be "given a title which describes its content," rather than "Exhibit A," etc., which Plaintiff has used in this case.

> The minimum DNAPL area cleanup requirements remain the breakdown of any DNAPL and a 90% reduction in VOCs in groundwater as set for in EPA's original Enforcement Action Memorandum. Multiple rounds of post-treatment sampling will be necessary to evaluate whether VOC concentrations in groundwater rebound. This will help assess whether ERH treatment achieves long-term compliance with cleanup standards. If ERH fails to achieve and maintain those requirements, additional measures will be required.

[Dkt. 14-7 at 5.] In other words, the EPA determined that environmental cleanup efforts were required at Third Site until the presence of VOCs was reduced by 90%, and mandated that the reduction be accomplished using ERH treatment.

### A. The Contract

In August 2016, Plaintiff submitted, and the EPA approved, a Technical and Cost Proposal ("Design Package") for Third Site. [Dkt. 1-2.] On October 4, 2016, Plaintiff and Defendant executed a contract ("the Contract") based on the Design Package, whereby Plaintiff would apply ERH treatment, as approved by the EPA, to a designated portion of Third Site enclosed by a sheet-pile wall. [Dkt. 1 at 2; Dkt. 14 at 2.] *See* Contract § 19.5 [Dkt. 14-2 at 33] (integration clause). Under the Contract, Plaintiff agreed to:

> design, install, and operate and maintain . . . an ERH system . . . to achieve a reduction in the concentration of total VOCs in groundwater in the Third Site DNAPL area to a depth of forty (40) feet and in the small ATT zone outside the sheet pile wall, by greater than 90% at both locations.

Contract § 1.1.5 [Dkt. 14-2 at 2]. This 90% reduction of VOCs at the designated area is the primary "Contract Goal." The operation and management of the ERH system was estimated to take "approximately twelve months." Contract § 2.1 [Dkt. 14-2 at 3].

As defined by the Contract, "Work" refers to "the accomplishment of the items to be performed by [Plaintiff] as set forth in the Contract Documents." Contract § 18.1.28 [Dkt. 14-2 at 31]. "Defective Work" is that which is "faulty, deficient, does not conform to the Contract Documents, does not meet the requirements of any sound engineering standard, practice or test,

3

does not operate as planned, is not fit for the intended purpose, or does not receive an approval referred to in the Contract Documents." Contract § 18.1.10 [Dkt. 14-2 at 29]. Plaintiff was required to supply "[a]ny Work, materials, or equipment that may reasonably be inferred from the Contract Documents as being necessary, convenient or required to produce the intended results (including timely completion)," Contract § 1.3 [Dkt. 14-2 at 2-3], and was further required to "confine the equipment, the storage of materials and equipment and the operations of workers" to Third Site. Contract § 7.5 [Dkt. 14-2 at 15]. Taken together, these two provisions differentiate "the Work" to be performed and any "equipment" used to perform such work.

      The Contract outlined the procedures that would be used to determine whether Plaintiff had satisfied its contractual obligations. First, when the presence of VOCs had successfully been reduced by 90%, Plaintiff was required to submit a Final Removal Action Report regarding the performance of the ERH System. Contract § 1.1.6 [Dkt. 14-2 at 2]. Importantly, "[t]he Work is not complete until EPA approval of the performance of all the Work is received." Contract § 1.1.6 [Dkt. 14-2 at 2]. Second, two rounds of groundwater sampling taken at least 90 days apart were required to confirm the achievement of the 90% reduction of VOCs. Contract § 1.1.7 [Dkt. 14-2 at 2]. This compliance sampling was to be done by a third party, *see* Contract § 1.2(iii) [Dkt. 14-2 at 2] (explicitly excluding "the conduct of compliance sampling" from Plaintiff's duties), and Defendant selected Ramboll U.S. Consulting Inc. ("Ramboll") to fulfil this role. [Dkt. 14 at 3.] The two rounds of compliance sampling were especially important to ensure that recontamination, or a "rebounding effect," had not occurred within the designated area. [Dkt. 14 at 3.] Again, Plaintiff's contractual obligations were not satisfied until the EPA approved the compliance samples and agreed that the presence of VOCs at Third Site had been successfully reduced by 90%. Contract § 1.1.7 [Dkt. 14-2 at 2]. Where necessary, Plaintiff was required to

4

promptly correct any Defective Work, or else Defendant was entitled to "have the Defective Work corrected." Contract § 12.5 [Dkt. 14-2 at 23]; *see* Contract § 13.2 [Dkt. 14-2 at 24] ("[Defendant] may have the Defective Work corrected and all costs of such correction will be borne and paid by [Plaintiff].").

Upon final EPA approval that the Work had been successfully completed, Plaintiff would then be permitted to, "if it wishes to do so, remove portable equipment such as the power control unit, condenser unit, blower and vapor treatment system" from Third Site. Contract § 1.1.7 [Dkt. 14-2 at 2]. There is no mention of removing non-portable equipment in the Contract. However, if any recontamination or rebounding occurred "within one year after the equipment has been removed," as demonstrated by subsequent groundwater sampling, Plaintiff would be required to "remobilize to the site, restore needed equipment and resume" the ERH cleanup efforts. Contract § 1.1.7 [Dkt. 14-2 at 2]. In the event that Plaintiff repeatedly failed to meet its contractual remediation goal of reducing the presence of VOCs in the designated area by 90%, Defendant was entitled to "terminate the services of [Plaintiff]" and finish the cleanup efforts "as [it] may deem expedient." Contract § 14.2 [Dkt. 14-2 at 24-25]. Importantly, in the event that Defendant terminated Plaintiff's services, "the termination will not affect any rights or remedies then existing or which may thereafter accrue." Contract § 14.2 [Dkt. 14-2 at 25]; *see* Contract § 13.3 [Dkt. 14-2 at 24] ("All of [Plaintiff]'s obligations, . . . and all other provisions of this Contract not directly affected by termination shall survive the termination of this Contract.").

### B. Factual History

With EPA approval intact, Plaintiff initially ran its ERH System at Third Site from November 7, 2018, to January 30, 2019. [Dkt. 1 at 5.] Plaintiff alleges that testing performed by Plaintiff on January 30, 2019, showed a reduction of VOCs in accordance with the Contract

Goal. [Dkt. 1 at 5.] Ramboll sampled the groundwater on March 29, 2019, however, and determined that, due to concentrations of VOCs, the remediation goals for Third Site had not been met. [Dkt. 14-4.] Plaintiff admits this disparity and notes it was a result of recontamination, or a "rebounding effect." [Dkt. 1 at 5.] Plaintiff resumed its ERH system from April 22, 2019, to July 5, 2019. [Dkt. 1 at 5.] Testing performed by Plaintiff on June 28, 2019, and again on August 2, 2019, showed a successful reduction of VOCs in line with the Contract Goal. [Dkt. 1 at 5.] However, Ramboll subsequently sampled the groundwater on September 5, 2019, and again determined that the required 90% reduction in VOCs had not been accomplished. [Dkt. 14-5.] Plaintiff asserts that the rebounding was a result of "a mass of contamination located outside the treatment area," and communicated such to Defendant.[2] [Dkt. 1 at 5.]

On November 12, 2019, Plaintiff advised Defendant that, because the remaining treatment "did not require all of [Plaintiff]'s equipment to remain" at Third Site, Plaintiff intended to remove such equipment. [Dkt. 1 at 8.] Plaintiff stated that "any future soil vapor and groundwater treatment could be performed using a skid-mounted vacuum blower, vacuum lift pump, and activated carbon treatment system." [Dkt. 1 at 8.]

On November 14, 2019, Defendant advised that it was considering declaring Plaintiff in default due to Defective Work, and Plaintiff restarted the ERH System on November 27, 2019. [Dkt. 1 at 5-6.] At the direction of Defendant, Plaintiff ceased ERH treatment on January 16, 2020. [Dkt. 1 at 6.] *See* Contract § 14.1 [Dkt. 14-2 at 24] (provision authorizing Defendant to "order [Plaintiff] to stop the Work" if the Work is defective). From November 2019 to July 2020,

---

[2] In its Complaint, Plaintiff asserts that Ramboll's sampling revealed an increase in contaminants "that were not part of the accepted contaminant list that [Plaintiff] had agreed to remediate," thereby constituting a "fundamental difference" as provided for by the Contract. [Dkt. 1 at 5.] *See* Contract §§ 7.2–7.3 [Dkt. 14-2 at 14] (provisions regarding fundamental difference).

because the presence of VOCs had still not been reduced by 90%, the parties went back and forth regarding proposed sampling plans to determine the cause and level of contamination at Third Site. [Dkt. 1 at 6-7.] On July 30, 2020, the parties executed a Limited Access Agreement granting Plaintiff permission to enter Third Site to observe Defendant's attempts to "determine the location of the residual contamination" and also perform "limited preventative maintenance activities," as defined in the agreement. [Dkt. 14-11.] Notably, Plaintiff agreed "that neither it nor anyone on its behalf shall remove any ERH related equipment from within the fenced-in area of the Site, although [Plaintiff] shall temporarily relocate and thereafter restore as needed such equipment to an alternative location(s) within the fenced-in area[.]" [Dkt. 14-11 at 2.]

Ultimately, and regardless of the reason, the 90% reduction in VOCs was not achieved and thus the EPA did not approve completion of the remediation as required by the Contract. [Dkt. 14 at 4.] This is undisputed. *See* [Dkt. 14-11] (Limited Access Agreement signed by both Plaintiff and Defendant on July 30, 2020, stating, in relevant part, that Plaintiff "implemented the ERH remedy but the EPA-mandated cleanup objectives for [Third Site] have not been met, giving rise to a dispute between [Plaintiff] and [Defendant] concerning the reasons for not meeting the objectives"). On December 17, 2020, Matthew Ohl, the Remedial Project Manager for the EPA, additionally confirmed that Third Site required further treatment. *See* [Dkt. 14-3] (email from Matthew Ohl to Defendant).

Following notice of its intent to do so, Defendant terminated Plaintiff's services on June 1, 2021, pursuant to Section 14.2 of the Contract, due to Plaintiff's alleged "multiple breaches and failure to achieve the cleanup objectives despite the passage of roughly five years since the ERH Contract was signed." [Dkt. 14 at 5-6.] *See* [Dkt. 14-6] (termination letter); *see also* Contract § 14.2(f) (provisions regarding "Default Termination"). Believing that an alternate

7

treatment may produce the desired results at Third Site, Defendant "proposed a different remediation strategy to the EPA that does not involve ERH treatment," but instead uses a process of bioremediation to reduce the presence of VOCs. [Dkt. 14 at 6.] The EPA has not yet approved or rejected Defendant's bioremediation proposal. [Dkt. 14 at 6.] Because the cleanup efforts at Third Site are governed by an EPA Enforcement Action requiring ERH treatment for VOCs, Defendant argues that it "may be required to use the ERH system to achieve the cleanup objectives" unless the EPA approves changes to the current remediation approach. [Dkt. 14-1 at 3.]

After shutting down operations at Defendant's direction, Plaintiff requested to return to Third Site and perform maintenance on its ERH equipment, although it is unclear exactly how many times Plaintiff made this request. [Dkt. 14 at 6.] *But see* [Dkt. 1-2 at 38] (statement in Plaintiff's Design Package that the ERH System "requires little maintenance once operations have begun"). Defendant appears to have granted the request(s), or at least attempted to cooperate fully. *See* [Dkt. 14-8] (emails discussing and approving Plaintiff's access to Third Site to perform maintenance). On at least two occasions, Defendant sought Plaintiff's confirmation that Plaintiff would not remove any equipment from Third Site while performing maintenance. [Dkt. 14-8 at 1, 3.] Plaintiff did not give such assurances and soon filed suit against Defendant. *See* [Dkt. 1].

On July 20, 2021, Plaintiff again requested access to Third Site to perform maintenance but, because of the recently filed lawsuit, Defendant stated that, under Federal Rule of Civil Procedure 34, "the parties needed to enter into an access agreement to permit entry onto the subject property." [Dkt. 14 at 7.] *See* [Dkt. 14-9] (email from Defendant to Plaintiff). Defendant sent Plaintiff a Proposed Limited Access Agreement on July 27, 2021, which was almost

8

identical to the one signed by both parties in July 2020 and included the same provision under which Plaintiff would not "remove any ERH related equipment from within the fenced-in area of the Site." [Dkt. 14-10 at 2.] Plaintiff refused to execute the Proposed Limited Access Agreement, however, on the grounds that "the equipment that is on site rightfully belongs to them." [Dkt. 14-12 at 1.]

## II. Discussion

After filing a Complaint against Defendant for breach of contract, conversion, and unjust enrichment, [Dkt. 1], Plaintiff filed the instant replevin motion on July 23, 2021. [Dkt. 7.] Pursuant to Indiana Code § 32-35-2-1, Plaintiff seeks immediate possession of the ERH equipment located at Third Site on the grounds that "Defendant has no right to the possession of the [ERH System]" under their Contract. [Dkt. 7 at 2.]

The sole issue here is whether, pursuant to Ind. Code § 32-35-2, Plaintiff is entitled to the replevin of the ERH System and related equipment currently located at Third Site. "A replevin action is a speedy statutory remedy designed to allow one to recover possession of property wrongfully held or detained as well as any damages incidental to the detention." *United Farm Family Mut. Ins. Co. v. Michalski*, 814 N.E.2d 1060, 1066 (Ind. Ct. App. 2004) (citing *State Exchange Bank of Culver v. Teague*, 495 N.E.2d 262, 266 (Ind. Ct. App. 1986)). In Indiana, an owner or claimant of personal property may bring an action for its immediate possession when

> any personal goods, including tangible personal property constituting or representing choses in action, are: (1) wrongfully taken or unlawfully detained from the owner or person claiming possession of the property; or (2) taken on execution or attachment and claimed by any person other than the defendant[.]

Ind. Code § 32-35-2-1. One seeking replevin of personal property may bring an action under this statute "at any time before final judgment."³ Ind. Code § 32-35-2-2. The claimant must file an affidavit showing that the property "has been wrongfully taken and is unlawfully detained by the defendant," among other requirements. Ind. Code §§ 32-35-1-3, 32-35-2-4(3)(A). Once the affidavit is filed, an order to show cause should be issued allowing the defendant to be heard. Ind. Code § 32-35-2-5.⁴

To succeed in an action for replevin, "the plaintiff must establish three elements: 'his title or right to possession, that the property is unlawfully detained, and that the defendant wrongfully holds possession.'" *Autocephalous Greek-Orthodox Church v. Goldberg & Feldman Fine Arts, Inc.*, 917 F.2d 278, 290 (7th Cir. 1990) (citing 25 Ind. L. Encyclopedia, *Replevin* § 42 (West 1960); *Snyder v. Int'l Harvester Credit Corp.*, 261 N.E.2d 71, 73 (Ind. Ct. App. 1970)). In determining whether these elements have been fulfilled, the language of the parties' Contract is of utmost importance. *See BKCAP, LLC v. Captec Franchise Trust 2000-I*, 572 F.3d 353, 359 (7th Cir. 2009) ("In the case of a written contract, the court determines the parties' intent by looking first to the plain and ordinary meaning of the contract language.") (citations omitted).

As explained in detail below, Plaintiff's ill-founded demand for immediate possession must fail because it has not shown that the ERH system is being unlawfully detained by

---

³ It is worth noting that, although Plaintiff is statutorily authorized to seek replevin, the Contract seems to limit Plaintiff's available remedies. *See* Contract § 9.5 [Dkt. 14-2 at 19] ("If [Plaintiff] considers any action or inaction of [Defendant] to be a breach of contract . . . [Plaintiff]'s exclusive remedy is the right to seek damages" (cleaned up)); *see also* Contract § 10.2 [Dkt. 14-2 at 20] ([Plaintiff]'s sole remedy in case of any dispute shall be an increase in the Contract Price to the extent allowed by the Contract Documents.").

⁴ Although the statute requires a show cause order, such an order is unnecessary here as Defendant has engaged in Plaintiff's motion by filing a Response and a Surreply. *See Sperro LLC v. Ford Motor Credit Co. LLC*, 64 N.E.3d 235, 245 (Ind. Ct. App. 2016) (explaining that the court is required to "'consider the showing made by the parties appearing'") (citing Ind. Code § 32-35-2-14).

10

Defendant. Rather, Defendant's temporary possession is contractually permissible, and to hold otherwise would violate not only the Contract, but also EPA directives.

### A. Plaintiff Has Established Its Title to the ERH System

First, Plaintiff must establish "his title [to] or right to possession" of the ERH System. Autocephalous Greek-Orthodox Church, 917 F.2d at 290 (citations omitted). To do so, Indiana law requires "the plaintiff or someone representing the plaintiff" to file an affidavit. Ind. Code § 32-35-2-3. The affidavit "must show that the plaintiff is the owner of the property or lawfully entitled to the possession of the property." Ind. Code § 32-35-2-4(1)(A)-(B) (cleaned up).

Here, Plaintiff filed the Amended Affidavit of D. Brent Winder, [Dkt. 16-1], stating that the affiant "is an employee of Plaintiff and speaks, in this instance, on Plaintiff's behalf," and that "Plaintiff is the owner of" the property in question. [Dkt. 16-1 at 1.] Attached to the affidavit are two lists enumerating Plaintiff's leased equipment, [Dkt. 16-2], and owned equipment, [Dkt. 16-3], located at Third Site. Such equipment is presumed to be the various components of the ERH System, which Defendant does not dispute that Plaintiff owns. *See* [Dkt. 14 at 8-9]. Accordingly, Plaintiff has satisfied the first element by showing its title to the property at issue.

### B. Plaintiff Has Failed to Establish Defendant's Unlawful Detainment and Wrongful Possession of the ERH System

Next, Plaintiff must establish "that the property is unlawfully detained and that the defendant wrongfully holds possession." Autocephalous Greek-Orthodox Church, 917 F.2d at 290 (citation omitted); Ind. Code § 32-35-2-4(3)(A)-(B). Because these two elements are closely intertwined in the instant matter, the Court considers them together.

Plaintiff presents two primary arguments in support of its claim that Defendant is unlawfully retaining possession of the equipment: (1) there are no contractual provisions which grant Defendant "unilateral possession" of the ERH equipment, and (2) Plaintiff is entitled to

immediate possession because Defendant terminated the Contract. [Dkt. 16.] Initially, Plaintiff is correct that the Contract lacks any explicit provision stating that Defendant may retain possession of the equipment in the event that Plaintiff's services are terminated. In hindsight, the parties clearly should have anticipated this possibility and addressed it in the Contract. However, Plaintiff fails to point out that the Contract also lacks any explicit provision stating that Plaintiff may remove the ERH System in the event of termination. Instead, Plaintiff asserts its entitlement to immediate possession on the grounds that the Contract fails to explicitly prohibit Plaintiff from removing its equipment at any time. [Dkt. 16 at 3.]

To support its arguments, Plaintiff points to Section 10.2 of the Contract, which provides that "[Plaintiff] shall, as directed by [Defendant], carry on the Work and adhere to the progress schedule during all disputes or disagreements with [Defendant]. No Work shall be delayed or postponed pending resolution of any disputes or disagreements, except as . . . [Defendant] terminates [Plaintiff.]" Contract § 10.2 [Dkt. 14-2 at 20]. Interestingly, this is the only provision Plaintiff leans on in support of its Motion for Immediate Possession, yet Plaintiff fundamentally misunderstands it. Section 10.2 refers specifically to the Work to be performed by Plaintiff, not the equipment itself, *see* Contract § 1.3 [Dkt. 14-2 at 2] (differentiating "Work, materials, or equipment"), and discusses termination of the contractor, not the contract itself. So, while Plaintiff may cease operating the ERH System upon termination by Defendant, Section 10.2 makes no mention of Plaintiff being entitled to remove its equipment upon such termination.

Moreover, Plaintiff is incorrect that Defendant "terminated the Contract between the parties."[5] [Dkt. 16 at 4.] In actuality, Defendant terminated Plaintiff's **services** under the Contract

---

[5] To be sure, although Defendant states that it "terminated the ERH Contract by letter dated June 1, 2021," [Dkt. 14 at 5], this is clearly a misstatement given the information contained in its termination letter, [Dkt. 14-6].

12

pursuant to Section 14.2(f). Titled "Default Termination," Section 14.2 provides that, if "[Plaintiff] repeatedly fails to perform the Work in accordance with the Contract Documents," then Defendant may "terminate the services of [Plaintiff]." Contract § 14.2 [Dkt. 14-2 at 25]. Defendant's termination letter from June 1, 2021, is titled "Notice of Default Termination" and specifically references Section 14.2 in its explanation. [Dkt. 14-6 at 1, 4.] Further, because "[t]he cleanup at Third Site is subject to EPA Consent Orders and all cleanup activities are done in coordination with and under the oversight and requirements of the EPA," [Dkt. 14 at 2], it follows that the Contract itself cannot be terminated without EPA authorization. The termination of Plaintiff's services under the Contract, however, allows Defendant to "finish the Work as [Defendant] may deem expedient," Contract § 14.2 [Dkt. 14-2 at 25], presumably by seeking an alternate contractor to operate the ERH System that is in place pursuant to the Contract.

Plaintiff further states that Defendant is planning to keep the ERH System "in perpetuity," *see* [Dkt. 16 at 2] ("[Defendant] further alleges that because the objectives of the Contract . . . have allegedly not been met, [Defendant] is entitled to keep [Plaintiff]'s equipment in perpetuity."); *see also* [Dkt. 16 at 4] ("[Defendant] argues it is entitled to perpetual possession"), but Defendant makes no such argument. As Defendant clearly explains,

> As recently as June 2021, the EPA informed [Defendant] that it believed another application of ERH treatment was needed. [Defendant] has urged the EPA to reconsider and allow implementation of bioremediation instead. If the EPA permits bioremediation without ERH treatment, [Defendant] will no longer be required to keep the ERH equipment at the site and [Plaintiff] can then retrieve it.

[Dkt. 17-1 at 2-3.] *See* [Dkt. 1-3 at 13-14] (provisions of the Consent Order requiring written EPA approval for any "additional work" deemed necessary to achieve the remediation goals at Third Site); *see also* [Dkt. 1-3 at 30] (provisions of the Consent Order requiring a written request to the EPA before deviating from any approved remediation plan).

13

Moreover, an aggregate reading of the Contract convinces the Court that Defendant is entitled to temporary possession of the ERH System until the EPA approves its alternate remediation strategy. *See Doermer v. Callen*, 847 F.3d 522, 535 (7th Cir. 2017) ("courts will read a contract as a whole, attempting to harmonize its provisions without rendering any meaningless") (citing *Ryan v. Lawyers Title Ins. Corp.*, 959 N.E.2d 870, 875 (Ind. Ct. App. 2011)).

First, the Contract requires Plaintiff to provide all equipment necessary to achieve the 90% reduction of VOCs, Contract § 1.3 [Dkt. 14-2 at 2-3], and further states that Plaintiff must keep such equipment located at Third Site. Contract § 7.5 [Dkt. 14-2 at 15]. This negates Plaintiff's inference that Defendant is a "thief," [Dkt. 16 at 5], as it grants Defendant lawful possession of the ERH System in order to achieve the explicit Contract Goal of reducing the presence of VOCs in the designated area of Third Site by greater than 90%. *See* Contract §§ 1.1.1 [Dkt. 14-2 at 1], 1.1.5 [Dkt. 14-2 at 2]. The sole mention of Plaintiff's removal of the ERH System appears in Section 1.1.7, which provides that Plaintiff "**may**, if it wishes to do so, remove portable equipment" **upon EPA approval that the Contract Goals have been met**. Contract § 1.1.7 [Dkt. 14-2 at 2] (emphasis added). Thus, Plaintiff is not permitted to remove the equipment until the EPA has confirmed that the Contract Goal has been met, which it will not do until Ramboll sampling shows a 90% reduction in VOCs as provided in Section 1.1.7. In fact, Plaintiff's Design Proposal that was approved by the EPA, [Dkt. 1-2], provides that:

> [Plaintiff] will provide the following services **upon completion of the [ERH treatment] project**:
>
> 1. Disconnect all electrical connections from electrodes and PDS;
> 2. Disconnect and dismantle water circulation system;
> 3. **Remove the treatment system**;
> 4. Disconnect and dismantle the surface facilities;
> 5. Demobilization of recoverable equipment from the site;

14

      6. Perform all site restoration activities; and
      7. Complete the Task Close Out Report.

[Dkt. 1-2 at 39] (emphasis added). Plaintiff also included the following provision in its EPA-approved Design Package:

> [Plaintiff] has also included an additional 90-day post-operations equipment rental period in accordance with Section 1.1.7 of the proposed contract, during which time operations are assumed to have ceased but the equipment stays onsite pending rebound verification sampling.

[Dkt. 1-2 at 25.] It is therefore increasingly clear that Plaintiff understood its equipment was to remain at Third Site until the EPA confirmed the Contract Goals had been accomplished.

Under Section 13.3, the parties agreed that "[a]ll of [Plaintiff]'s obligations, . . . and all other provisions of this Contract not directly affected by termination shall survive the termination of this Contract." Contract § 13.3 [Dkt. 14-2 at 24]. Accordingly, Plaintiff's obligation to "confine equipment, the storage of materials and equipment and the operations of workers to the project Site" remains intact. Contract § 7.5 [Dkt. 14-2 at 15]. Defendant is therefore correct that Plaintiff's obligations to provide and store the necessary equipment at Third Site until the Contract Goal is met survives the termination of Plaintiff's services under the Contract. *See* [Dkt. 17-1 at 1-2].

In the simplest of terms, the Contract provides that Plaintiff was to apply ERH treatment to a designated area at Third Site in order to reduce the presence of VOCs by 90%. Contract §§ 1.1.1 [Dkt. 14-2 at 1], 1.1.5 [Dkt. 14-2 at 2]. Plaintiff's contractual obligations will not be satisfied until the EPA, after receiving at least two rounds of confirmation samples from Ramboll, agrees that the 90% remediation has been achieved. Contract §§ 1.1.6, 1.1.7, 1.2 [Dkt. 14-2 at 2]. Plaintiff was required to supply all necessary equipment and materials to achieve this goal, and was further required to keep that equipment at Third Site. Contract § 1.3 [Dkt. 14-2 at

15

2-3], 4.5 [Dkt. 14-2 at 8], 7.5 [Dkt. 14-2 at 15]. Only upon final EPA approval is Plaintiff permitted to remove portable equipment from Third Site, with the caveat that Plaintiff would be required to remobilize the equipment if any recontamination occurred in the designated area within one year of the EPA's final approval of the 90% remediation. Contract § 1.1.7 [Dkt. 14-2 at 2]. In the event that Plaintiff did not achieve the 90% reduction, Defendant was entitled to terminate Plaintiff's services. Contract § 14.2 [Dkt. 14-2 at 24-25]. Doing so, however, did not alter the fact that the 90% reduction was still to be achieved using the ERH equipment that Plaintiff provided, nor did it affect the fact that the equipment was to remain at Third Site. Contract § 13.3 [Dkt. 14-2 at 24].

Currently, Defendant does not intend to continue using ERH treatment at Third Site and has requested permission from the EPA to instead utilize bioremediation to achieve the 90% reduction of VOCs. However, because all remediation efforts at Third Site are strictly governed by the EPA, Defendant cannot begin using bioremediation in place of ERH treatment until the EPA approves its proposed strategy.[6] Therefore, the ERH equipment must remain at Third Site until the EPA grants Defendant permission to use bioremediation instead. At that point, and only at that point, will Plaintiff, with Defendant's agreement, be able to remove its equipment from Third Site. This conclusion is consistent with the parties' provision that, "[i]n case of discrepancies, ambiguity or disagreement as to the meaning or intent of words, terms or phrases in the Contract Documents, the more stringent requirements for [Plaintiff] shall govern." Contract § 1.3 [Dkt. 14-2 at 3].

---

[6] By demanding immediate possession from Defendant while Defendant is merely complying with EPA directives by temporarily keeping the equipment at Third Site, Plaintiff is improperly conflating the EPA's inaction with Defendant's action. *See* Contract § 2.2 [Dkt. 14-2 at 4] ("Actions or inactions of the EPA shall not be attributed to [Defendant].").

Accordingly, although Plaintiff has established title to the ERH System, it fails to make a successful replevin claim under Ind. Code § 35-32-2 because Plaintiff has not demonstrated that Defendant is unlawfully detaining the property. If/when the EPA approves Defendant's request to replace ERH treatment with bioremediation, then Plaintiff may seek Defendant's permission to obtain possession of its property. Until then, the property must remain at Third Site, as contracted for by the parties in 2016.

### III. Conclusion

For the reasons set forth above, the Magistrate Judge recommends that Plaintiff's Motion for Immediate Possession, [Dkt. 7], be **DENIED** on the grounds that Plaintiff has not established that Defendant is unlawfully possessing or detaining the property under Ind. Code § 32-35-2. In addition, Defendant's Motion to Strike, [Dkt. 15], is **DENIED AS MOOT**, and Defendant's Motion to Leave to File Surreply, [Dkt. 17], is **GRANTED**.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Failure to timely file objections within 14 days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated: 29 SEP 2021

_____
Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the Court's ECF system.