# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MCMILLAN MCGEE CORP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-01988-TWP-MJD |
| | ) | |
| THIRD SITE TRUST FUND, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| THIRD SITE TRUST FUND, | ) | |
| | ) | |
| Counter Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MCMILLAN MCGEE CORP, | ) | |
| THE GUARANTEE COMPANY OF NORTH | ) | |
| AMERICA USA, | ) | |
| | ) | |
| Counter Defendants. | ) | |

## ORDER DENYING COUNTER-DEFENDANT GUARANTEE COMPANY'S MOTION TO DISMISS COUNT II OF COUNTER-CLAIMANT TRUST'S AMENDED COUNTERCLAIM

This matter is before the Court on Counter-Defendant The Guarantee Company of North America's (the "Guarantee Company") Motion to Dismiss Count II of Counter-Claimant Third Site Trust Fund's (the "Trust") Amended Counterclaim ("Partial Motion to Dismiss") (Filing No. 90). The Trust and Plaintiff McMillan McGee Corp ("McMillan") entered into a contract for remediation services of a contaminated property near Zionsville, Indiana. McMillan obtained a performance bond and payment bond from the Guarantee Company related to those services. Contractual disputes arose between McMillan and the Trust, and McMillan initiated this action. The Trust filed counterclaims against McMillan and later asserted counterclaims against the Guarantee Company regarding the bonds. The Guarantee Company has filed the instant Partial

Motion to Dismiss, seeking to dismiss Count II of the Trust's counterclaims against it.  For the following reasons, the Guarantee Company's Partial Motion to Dismiss is **denied**.

## I.      BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the Trust as the non-moving party.  *See Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

This case involves remediation efforts at a contaminated property near Zionsville, Indiana, known as Third Site (Filing No. 77 at 40, ¶ 7).  The Trust was created in 1999 and amended in 2002 pursuant to orders of the United States Environmental Protection Agency to investigate and fund the cleanup at Third Site.  *Id.* at 41, ¶ 9.  In October 2016, the Trust entered into a contract (the "Contract") with McMillan under which McMillan would perform and complete remediation work at Third Site.  *Id.* at 41, ¶ 10.  Pursuant to the Contract, McMillan obtained a performance bond (the "Performance Bond") and a payment bond (the "Payment Bond") from Guarantee Company.  *Id.* at 60, ¶¶ 8–9.  Both bonds use the language from form bonds ("Form A312") published by the American Institute of Architects.  *Id.*

The Payment Bond is the focus of the instant Partial Motion to Dismiss.  As a general matter, the Payment Bond ensures that McMillan's subcontractors are paid for work performed pursuant to the Contract.  The Payment Bond contains the following relevant provisions:

> § 1      The Contractor [McMillan] and Surety [the Guarantee Company], jointly and severally, bind themselves . . . to the Owner [the Trust] to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms. . . .

> § 3      If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety . . . of claims, demands, liens or suits against

the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

§ 4      When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

(Filing No. 77-3 at 8).

Disputes arose between the Trust and McMillan regarding performance of their respective obligations under the Contract, and as a result, McMillan filed a Complaint against the Trust on July 8, 2021 (Filing No. 1). The Trust filed its original answer on September 7, 2021 (Filing No. 23). On March 30, 2022, the Trust moved for leave to join the Guarantee Company as a defendant and assert two crossclaims against it under the Performance Bond (Filing No. 58; Filing No. 59). On May 2, 2022, the Court granted in part and denied in part the Trust's motion, allowing the Trust to join the Guarantee Company as a counter-defendant and assert the proposed crossclaims as counterclaims (Filing No. 64).  The Trust filed an amended answer with counterclaims against the Guarantee Company on May 16, 2022 (Filing No. 65).

On July 14, 2022, as part of the ongoing litigation, McMillan sent the Trust a statement of special damages, which included line-items for "Minor Subcontractor Costs" of $60,396.74 and "MK Environmental Continued Costs" of $2,836,915.00, among others (Filing No. 77-4 at 17). McMillan also sent the Trust an invoice from its subcontractor, MK Environmental Inc., dated June 2, 2022, showing the alleged $2,836.915.00 in costs. *Id.* at 19.

The Trust then sent a letter dated August 15, 2022, to McMillan and the Guarantee Company requesting that the Guarantee Company "(a) fulfill its contractual obligations under the Payment Bond and promptly remit payment for all such labor, materials and equipment furnished for by [sic] McMillan's vendors and subcontractors in performance of the Contract and that were

3

included in McMillan's claims for damages and (b) defend, indemnify, and hold harmless the Trust against such claims" (Filing No. 77 at 66, ¶ 40).

On August 15, 2022, the Trust filed a second amended answer, which amended the Trust's counterclaims against the Guarantee Company to add Count II for breach of the Payment Bond (the "Amended Counterclaims").[1]   On September 20, 2022, the Guarantee Company filed the Partial Motion to Dismiss Count II, which is now before the Court for review.

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A party seeking dismissal under Rule 12(b)(6)'s requirement that the complaint state a claim upon which relief can be granted bears a heavy burden. In making this determination, the court views the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true and drawing all reasonable inferences from those allegations in favor of the plaintiff. *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003); *Bielanski*, 550 F.3d at 633; *Cozzi Iron & Metal*, 250 F.3d at 574 (similar standard for dismissal of a counterclaim). The plaintiff "receives the benefit of imagination" at this stage "[as] long as the hypotheses are consistent with the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994).

---

[1] The Trust's second amended answer with amended counterclaims was filed without leave of Court, in violation of Federal Rule of Civil Procedure 15(a)(1), which provides that "[a] party may amend *its pleading once* as a matter of course" within the prescribed time period. Rule 7(a) clarifies what filings are "pleadings," and a counterclaim is not a "pleading." The Trust's reliance on Rule 15(a)(1)(B) is therefore misplaced (Filing No. 77 at 2 n.1). The Trust's only "pleading" was its answer, which was already previously amended once with leave of Court (Filing No. 64; Filing No. 65). The Court additionally notes that the Trust's improper filing of its second amended answer not only violated Rule 15(a)(1), but it also violated the Court's May 2, 2022 Order, which gave the Trust only fourteen days in which to file an amended pleading (Filing No. 64 at 4), and it deprived the Counter-Defendants an earlier opportunity to oppose leave to add the counterclaim now at issue (Count II). The Trust was required to seek leave (under Rule 13(e), Rule 15(a)(2), or another Rule) to file the second amended answer and amended counterclaims but wholly failed to do so. Nevertheless, neither Counter-Defendant has moved to strike the Trust's second amended answer. For that reason, and because this case is now already in its late stages, the Court declines to *sua sponte* strike the second amended answer.

Thus, a complaint should only be dismissed pursuant to Rule 12(b)(6) when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). "To withstand a Rule 12(b)(6) challenge . . . 'the plaintiff must give enough details about the subject-matter of the case to present a story that holds together,' and the question the court should ask is '*could* these things have happened, not *did* they happen.'" *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010)) (emphasis in original).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level."  550 U.S. 544, 555 (2007).  Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient.  *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.  Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

### III.   <u>DISCUSSION</u>

The Amended Counterclaim asserts three counts against the Guarantee Company--Count I: Breach of Performance Bond; Count II: Breach of Payment Bond; and Count III: *in the alternative* Declaratory Judgment.  (Filing No. 77 at 62-67.)  In its Partial Motion to Dismiss, the Guarantee Company seeks to dismiss only Count II of the Amended Counterclaims.  *Id.* at 64, ¶¶ 31–43.  The Guarantee Company argues Count II should be dismissed because: (a) the Trust, as the obligee, lacks authority to sue for recovery under the Payment Bond; (b) the Trust has not alleged a "Claimant" filed a "Claim" with the Guarantee Company, which is a prerequisite for obtaining relief under the Payment Bond; and (c) the Trust has failed to sufficiently allege that any of McMillan's subcontractors have not been paid or are seeking payment (Filing No. 91 at 14–21).  In response, the Trust argues that it may sue under the Payment Bond; that no "Claim" or "Claimant" is required to obtain the requested relief; and the Trust has adequately alleged the existence of a claim seeking payment for McMillan's subcontractors' costs, which triggers the Guarantee Company's obligations under the Payment Bond (Filing No. 104 at 5–13).  The Court will address each argument in turn.

### A.   <u>Payment Bonds Obligee's Authority to Sue</u>

The Guarantee Company "[p]reliminarily" argues that the general purpose of payment bonds is to benefit subcontractors, not obligees, so the Trust lacks authority to sue under the Payment Bond (Filing No. 91 at 11–12).  The Guarantee Company cites decisions from several federal courts holding that obligees generally may not recover from the surety under a payment bond. In response, the Trust argues that the cases cited by the Guarantee Company are distinguishable (Filing No. 104 at 7–8).  The Court agrees with the Trust that it is not precluded from suing under the Payment Bond.

6

Although one purpose of a payment bond is to ensure that subcontractors are paid in the event of a contractor's default, that is not its only purpose.  As several courts have recognized, payment bonds also serve to protect the obligee from claims by unpaid subcontractors. *See, e.g.*, *Eastern Steel Constructors, Inc. v. Int'l Fid. Ins. Co.*, 282 A.3d 827, 851 (Pa. Super. Ct. 2022) (discussing purpose of Form A312 payment bond under Pennsylvania law; "Certainly, it is by no coincidence that Section 1 of the Payment Bond is written to protect an owner . . . from claims that may be lienable against its property under the Lien Law. . . . Sections 2 and 3, however, assure payment for 'all sums due' Claimants, which, by the breadth of this language, extends beyond those limited items that maybe liened against an owner's property. . . ."); *Allegheny Cas. Co. v. Archer-Western/Demaria Joint Venture III*, No. 13-cv-128, 2014 WL 10915507, at *4 (M.D. Fla. June 16, 2014) ("Construing the bond as a whole, the parties' intent was to guarantee that [the contractor] would pay for its labor and materials used in performing the subcontract, and that [the obligee] would be protected from liability in the event that [the contractor] failed to pay."); *Dormitory Auth.-State of N.Y.*, 735 F. Supp. 2d at 86 ("Courts have identified at least two main purposes for the statutory bonding requirement . . .  Second, [the bonding statute] protects the State, as owner, as well," by "helping 'maintain[] the [owner's] property free of any mechanics' liens by unpaid materialmen, suppliers, or laborers.'" (alterations in original) (quoting *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 69 (2d Cir. 2004)); *Standard Accident Ins. Co. of Detroit v. Rose*, 234 S.W.2d 728 (Ky. 1950) (stating "[t]he purpose and only purpose" of a payment bond "is to protect the owner against the claims of those who furnish labor and materials to the contractor"); *see also* Steven Plitt et al., *Couch on Insurance* § 163:10 (3d ed. 2023) ("A labor and material payment bond guarantees the owner that all bills for labor and materials contracted for and used by the contractor will be paid by the surety if the contractor defaults.").

7

This second purpose would be defeated if courts were to hold that an obligee cannot enforce a surety's obligation to pay subcontractors simply because the contractor, instead of the subcontractors, demanded that the obligee pay the amounts owed to those subcontractors.  In this case, the Payment Bond serves to protect the Trust from claims for amounts owed to McMillan's subcontractors, even though McMillan, and not its subcontractors, is the one allegedly asserting those claims.

The Guarantee Company also cites cases from several federal courts holding that obligees, like the Trust, generally lack standing to sue under payment bonds (Filing No. 107 at 3).  But the claims at issue in those cases are distinguishable from the Trust's claim.  In each of the cited cases, the obligee alleged that the surety owed the obligee the face value of the payment bond because the surety had failed to timely pay the claimants (*i.e.*, the subcontractors).  *See Travelers Cas. & Sur. Co. v. Dormitory Auth.-State of N.Y.*, 735 F. Supp. 2d 42, 87 (S.D.N.Y. 2010) (involving breach of contract claim brought by obligee suing surety under payment bond for amounts obligee was allegedly forced to pay subcontractors); *Fed. Ins. Co. v. Maine Yankee Atomic Power Co.*, 183 F. Supp. 2d 76, 87 (D. Me. 2001) (discussing unjust enrichment claim brought by obligee to recover amounts obligee paid to subcontractors); *BT Granite Run, LP v. Bondex Ins. Co.*, No. CV 17-1584, 2017 WL 4642090, at *2 (E.D. Pa. Oct. 17, 2017) (denying summary judgment as to obligee's claim seeking to recover amounts owed to subcontractors because obligee presented evidence that it had paid subcontractors); *cf. U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 69–70 (holding that claims for amounts that obligee paid to materialmen were not appropriately brought under performance bonds but would have been appropriate under payment bond); *Ayers Enters, Ltd. v. Exterior Designing, Inc.*, 829 F. Supp. 1330, 1332–33 (N.D. Ga. 1993) (holding obligee was prohibited by Georgia state statute from suing under payment bond).

The Guarantee Company quotes the Second Circuit's decision in *Braspetro* and argues that the court "held the Sureties in that case liable to the owner/bond obligee only under the performance bond, and not under the payment bond" (Filing No. 107 at 5 (emphasis omitted)). The Guarantee Company misreads *Braspetro*. The only bonds at issue in *Braspetro* were performance bonds. *Braspetro*, 369 F.3d at 40 (defining "Bonds" as two performance bonds). The *Braspetro* obligee did not sue under a payment bond, and both the district and circuit courts addressed only what recovery could be had under the performance bonds. The Second Circuit held that although the obligee could not recover amounts owed to materialmen under the performance bonds, the obligee's claim "would have been appropriate under a payment bond." *Id.* at 69–70. *Braspetro* therefore cuts against the Guarantee Company's position.

Here, the Trust is not suing for the face value of the Payment Bond, or for any other amounts allegedly owed to McMillan's subcontractors. The Trust is only seeking damages arising from the Guarantee Company's breach of contractual duties owed to the Trust: the duty to ensure payment to the subcontractors and to protect the Trust from claims for nonpayment. Additionally, the above-cited cases are distinguishable because the payment bonds in those cases apparently did not provide for any duties expressly owed by the surety to the obligee, like the obligations in Section 4 of the Payment Bond here.[2] *See Sonoma Springs Ltd. P'ship v. Fid. & Dep. Co. of Md.*, 409 F. Supp. 3d 946, 961 (D. Nev. 2019) (involving Form A312 payment bond; denying summary judgment as to obligee's breach of payment bond claims not based on "Claimant" status). Accordingly, the cases cited by the Guarantee Company are inapplicable. The Trust is not precluded from asserting Count II because it is the Payment Bond obligee.

---

[2] *See, e.g.*, Complaint at Ex. B, *BT Granite Run, LP*, No. CV 17-1584, 2017 WL 4642090 (Dkt. 1-1 at 28–29); Affidavit of Charles K. Bartlett in Support of DASNY's Motion for Summary Judgment at Exs. 5, 10, *Dormitory Auth.-State of N.Y.*, 07 Civ. 6915, 735 F. Supp. 2d 42 (Dkt. 445-2 at 25–31, 34–41).

**B.**     <u>**Requirement of "Claim" filed by a "Claimant"**</u>

The Guarantee Company next argues that Count II must be dismissed because the Trust has not identified a "Claim" filed by a "Claimant," as those terms are defined by the Payment Bond.  The Guarantee Company asserts that its contractual obligations to the Trust are not triggered until and unless a "Claim" is filed by a "Claimant," so the Guarantee Company did not owe (or breach) any duties to the Trust (Filing No. 91 at 16).  The Trust responds that neither a "Claim" nor "Claimant" is needed to trigger the Guarantee Company's obligations (Filing No. 104 at 8–9).  Based on a plain reading of the Payment Bond, the Court agrees with the Trust.

Under the Payment Bond, the Guarantee Company owes the Trust two obligations: a payment assurance obligation and an indemnity obligation. The payment assurance obligation is found in Section 1, which provides that the Guarantee Company and McMillan "jointly and severally, bind themselves . . . to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract."  (Filing No. 77-3 at 8.)  The indemnity obligation is found in Section 4, which states that upon satisfaction of the conditions in Section 3, "the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit."  *Id.*  Section 3 states that the Guarantee Company's obligation shall arise "[i]f there is no Owner Default" and after the Trust has "promptly notified" McMillan and the Guarantee Company "of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits."  *Id.*

The Guarantee Company does not address this language in much detail, focusing instead on the language of Sections 5 and 7, which govern the Guarantee Company's obligations to "Claimants" (Filing No. 91 at 14–17).  This focus is misplaced.  While the Amended Counterclaims

do allege that the "Guarantee Company has failed to discharge its obligations to Claimants under Section 7," Count II is not based on an alleged breach of Sections 5 or 7.  Rather, Count II alleges that the Guarantee Company "breached the Payment Bond by failing to honor its obligations *to the Trust*" to ensure McMillan's subcontractors are paid and to indemnify the Trust against claims for nonpayment by those subcontractors (Filing No. 77 at 65–66, ¶¶ 40–42 (emphasis added); Filing No. 104 at 10 ("[T]he Trust is not seeking recovery of the subcontractor payments for itself. Rather, it demands only that these payments be issued to McMillan's unpaid vendors and subcontractors.")).  The prerequisites in Sections 5 and 7 are therefore inapplicable.

Further, although the Payment Bond defines the terms "Claimant" and "Claim" and uses those terms in other sections (like Sections 5 and 7), those defined terms appear nowhere in Sections 1, 3 or 4.  The Payment Bond plainly provides that the Guarantee Company's indemnity obligations to the Trust are triggered by "claims, demands, liens or suits" against the Trust by "any person or entity seeking payment," not just a "Claim" by a "Claimant" (Filing No. 77-3 at 8).  If the parties to the Payment Bond had intended for the Guarantee Company's obligations to the Trust to be triggered only upon receipt of a "Claim" by a "Claimant," they could have used those terms in Sections 1, 3, or 4.  *See Cocquyt v. SpartanNash Co.*, No. 21-3254, 2022 WL 3273804, at *4 (7th Cir. Aug. 11, 2022) ("[A]s revealed elsewhere in the contract, the parties knew how to express when they definitively wanted a provision to survive the initial three-year term . . . . Nothing in the language of section 5(e) states that it, like section 6, outlast the three-year term."); *Fix v. Quantum Indus. Partners LDC*, 374 F.3d 549, 552–53 (7th Cir. 2004) ("There is a strong presumption against reading into contract provisions that easily could have been included but were not."); *Simon Prop. Grp., L.P. v. Mich. Sporting Goods Distribs., Inc.*, 837 N.E.2d 1058 (Ind. Ct. App. 2005) ("If the parties had intended Section 24.23 to include other rights and remedies in

addition to the reduced rent, other sections of the Lease indicate the parties knew how to include such language.").  Based on the parties' use of noticeably broader language when discussing the obligations owed to the Trust, the Court agrees with the Trust that neither a "Claim" nor a "Claimant" is needed to trigger those obligations.

To assert its breach claim, then, the Trust must only have alleged that it provided prompt notice of "claims, demands, liens or suits against the Owner . . . by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract" (Filing No. 77-3 at 8).  The Trust argues that McMillan's special damages statement is a "claim[], demand[], lien[] or suit[] . . . by any person or entity seeking payment" and that the Trust provided prompt notice of this claim via its August 15, 2022 letter (Filing No. 104 at 6; Filing No. 77 at 65, ¶ 40).

The Guarantee Company acknowledges that McMillan's special damages statement "is, in essence a demand for payment from McMillan" (Filing No. 91 at 19), but it contends that the Trust has still failed to show "evidence of a demand or claim *from McMillan's subcontractors/vendors* seeking payment." *Id.* (emphasis added).  The Guarantee Company's argument, however, relies on language in the Payment Bond that simply is not there.  A claim for payment under Section 3 need not be from an unpaid subcontractor or vendor; the claim need only be from "any person or entity" seeking payment for costs incurred in performance of the Contract.  The special damages statement sent by McMillan seeking payment for subcontractor costs incurred in performance of the Contract therefore qualifies as a claim under Section 3.

## C.   Allegations of Claim for Payment Sufficient to Trigger Contractual Obligations

The Guarantee Company lastly argues that Count II must be dismissed because the Trust has not sufficiently alleged that any of McMillan's subcontractors have not been paid (Filing No. 91 at 18).  The Trust responds that McMillan's statement of special damages, in combination with

the MK Environmental invoice, creates a reasonable inference that those subcontractors have not been paid (Filing No. 104 at 11–12).  The Court again agrees with the Trust.

McMillan's statement of special damages includes two line-items that appear to be outstanding subcontractor costs—"Minor Subcontractor Costs" of $60,396.74 and "MK Environmental Continued Costs" of $2,836.915.00" (Filing No. 77-4 at 17). At least with respect to MK Environmental, the Court can reasonably infer that McMillan has not paid that subcontractor and is seeking payment from the Trust as to the amounts owed to MK Environmental. The inference is reasonable for two reasons. First, the statement of special damages seeks "Continued" costs from MK Environmental. Second, the invoice from MK Environmental, dated June 2, 2022, shows costs accrued as early as May 2018, as well as monthly charges for system and generator rentals that continued to accrue at least through June 2, 2022 (Filing No. 77-4).

The Trust also asserts that McMillan failed to produce any documents showing payments to subcontractors, including MK Environmental, indicating that McMillan's subcontractors have not been paid (Filing No. 104 at 3).  The only discovery responses attached to the Amended Counterclaims are responses from the Guarantee Company, not McMillan (Filing No. 77-4 at 21–32).  Because McMillan's discovery responses are not a part of the pleadings, the Court may not consider them at this stage.

It is reasonable to infer that the amounts demanded by McMillan in its statement of special damages are amounts owed to its subcontractors, and the Court is obligated to draw all reasonable inferences in the Trust's favor at the pleadings stage.  Count II sufficiently alleges a claim for breach of the Payment Bond, so the Guarantee Company's Partial Motion to Dismiss is **denied**.

13

## IV.    <u>CONCLUSION</u>

For the reasons discussed above, the Guarantee Company's Partial Motion to Dismiss (Filing No. 90) is **DENIED**.

**SO ORDERED**.

Date:    9/26/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles J. Maiers
DUE DOYLE FANNING  & ALDERFER LLP
cmaiers@duedoyle.com

Christopher J. Appel
DUE DOYLE FANNING & ALDERFER LLP
cappel@duedoyle.com

Vincent P. Antaki
REMINGER CO. LPA (Indianapolis)
vantaki@reminger.com

Kevin Morris Toner
PLEWS SHADLEY RACHER & BRAUN LLP
ktoner@psrb.com

Ryan Taylor Leagre
PLEWS SHADLEY RACHER & BRAUN
rleagre@psrb.com

Brian Charles Padove
WATT TIEDER HOFFAR & FITZGERALD, LLP
bpadove@watttieder.com

John E. Sebastian
WATT, TIEDER, HOFFAR AND FITZGERALD LLP
jsebastian@watttieder.com