# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| MCMILLAN MCGEE CORP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. 1:21-cv-01988-TWP-MJD |
| | ) |
| THIRD SITE TRUST FUND, | ) |
| | ) |
| Defendant. | ) |
| ——————————————— | ) |
| | ) |
| THIRD SITE TRUST FUND, | ) |
| | ) |
| Counter Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| MCMILLAN MCGEE CORP, | ) |
| THE GUARANTEE COMPANY OF NORTH | ) |
| AMERICA USA, | ) |
| | ) |
| Counter Defendants. | ) |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Third Site Trust Fund's (the "Trust") Motion for Summary Judgment on Plaintiff McMillan McGee Corp.'s ("McMillan") Complaint and for partial summary judgment against McMillan on Count II of the Trust's Counterclaim (Filing No. 144) and McMillan's Motion for Summary Judgment (Filing No. 154). For the following reasons, the Trust's Motion for Summary Judgment on all counts in McMillan's Complaint is **granted**, the Trust's Partial Motion for Summary Judgment as to Count II of its Counterclaim as to liability only is **granted**, and McMillan's Motion for Summary Judgment is **denied**.

# I.   <u>BACKGROUND</u>

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to the non-moving party for each respective motion. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This case involves multiple parties with varying claims, numerous contract provisions, and a plethora of facts. This background section is not intended to provide a comprehensive explanation of all the facts of this case, rather, it only discusses those relevant to these two motions.

## A.   <u>Factual Background</u>

This case is about a contractual dispute between McMillan, an environmental remediation company, and the Trust, a trust created by the U.S. Environmental Protection Agency ("EPA"), to fund the cleanup of a contaminated property known as Third Site ([Filing No. 14-2 at 1](#)). On May 11, 2001, the EPA issued an Enforcement Action Memorandum ("EAM") documenting the "determination of an imminent and substantial threat to public health and the environment, and the non-time critical removal action to be performed at [Third Site]." ([Filing No. 14-7 at 10](#)). Third Site is a tract of land that occupies two acres in Zionsville, Boone County, Indiana ([Filing No. 14-7 at 1](#), 11). On the site was the presence of soil and groundwater contaminated with dense non-aqueous phase liquids ("DNAPL") and other volatile organic compounds ("VOCs"). *Id.* at 10. The DNAPL area was approximately 4,500 square feet with an estimated depth of up to 41 feet, enclosed by a sheet of pile wall. *Id.* at 3.

1.      **The Contract**

In 2016, the Trust entered into a Contract with McMillan that required McMillan to remediate contamination at Third Site (Filing No. 14-1 ¶ 4; *see* Filing No. 14-2) (the "Contract").[1] McMillan was responsible for the design, installation, operation, and maintenance of an Electrical Resistance Heating ("ERH") system to achieve a reduction in the concentration of total VOCs in groundwater in the Third Site DNAPL area to a depth of forty (40) feet and in the defined Additional Thermal Treatment Zone (the "ATT zone") zone outside the sheet pile wall, by greater than 90% at both locations." (Filing No. 14-2 at 2, §§ 1.1.1, 1.1.5; *see* Filing No. 1 at 2 ¶12). Under the contract, McMillan's work obligations are not complete "until EPA approval of the performance of all the Work is received." *Id.* § 1.1.6.

The Contract outlines a multi-step sampling and verification process for determining whether McMillan achieved the 90% reduction cleanup objective (Filing No. 14-1 ¶ 6). Ramboll U.S. Consulting Inc., f/k/a/ Ramboll Envion. ("Ramboll") was to complete the groundwater sampling, not McMillan. *Id.* Ramboll would complete two rounds of confirmation sampling at least 90 days apart to confirm achievement of the cleanup objectives and to ensure that the contamination had not "rebounded" within the DNAPL area. *Id.*; (Filing No. 14-2 at 2 § 1.1.7). After the EPA has agreed that, as a result of sampling, the cleanup objectives set forth in Sections 1.1.1 and 1.1.5 have been met and a second round of sampling confirms achievement of those cleanup objectives, McMillan could remove the ERH equipment (Filing No. 14-2 at 2 § 1.1.7).

---

[1] At the heart of this dispute is the interpretation of various contract provisions and calculation of sampling results. While the parties agree on which contract provisions are relevant, they differ on their interpretation and application in the case. Relevant contract provisions will be included in the Discussion section below as needed. Copies of the sampling results will also be included in the Discussion section when relevant.

###### 2.     McMillan's Work at Third Site

On September 24, 2018, McMillan began the first round of ERH treatment (Filing No. 156-11 at 1). McMillan completed its own sampling which indicated to them a reduction of VOCs that met the contract goals (Filing No. 156-7 at 4). McMillan ceased operations 122 days later on January 24, 2019, believing it had achieved the cleanup objective (Filing No. 145-11 at 15-16). Pursuant to the Contract, Ramboll conducted confirmatory sampling on March 29, 2019, to determine whether McMillan had actually achieved the cleanup objective, a greater than 90% reduction in total VOCs in the groundwater in the DNAPL area (Filing No. 14-1 at 2-3 ¶ 9; *see* Filing No. 14-4). The sampling results showed that McMillan failed to achieve all its required cleanup objectives (Filing No. 14-2 at 1-2). Ramboll shared the sampling results with the Trust and McMillan (Filing No. 14-4 at 1).

After receiving the sampling results from Ramboll, McMillan informed the Trust and the EPA that it planned to restart ERH treatment on or about April 22, 2019 (*see* Filing No. 156-15). McMillan's second round of ERH treatment started April 2019 and continued until July 5, 2019. *Id.* McMillan again decided to perform its own internal sampling and informed the Trust that it had achieved the required 90% reduction in VOCs in groundwater (Filing No. 156-7 at 1). On September 5, 2019, Ramboll conducted another round of confirmatory sampling (Filing No. 145-5). Those sampling results showed that McMillan had not achieved the cleanup objectives at P-1 and P-2 (Filing No. 14-5). The sampling results also showed a high presence of the compound 1,2-Dichlorobenzene (Filing No. 156-18).

After receiving the second round of sampling results from Ramboll, McMillan informed the Trust that there appeared to be VOCs beyond the 40-foot targeted area, which were leaking into the soil (Filing No. 145-16). McMillan sought an adjustment to the Contract price based on these purported site conditions. *Id.* Except as provided in Section 7.2 and 7.3, McMillan had full

responsibility with respect to the physical conditions at or relating to the Site including surface, subsurface and other existing conditions (Filing No. 14-2 at 13 § 7.1).

In the event the Site differed from what was known at the time the parties entered the Contract, McMillan was entitled to additional time and compensation to complete its treatment:

> Differing Conditions Resulting from Inaccurate Data – If [McMillan] believes that (a) there is an error in the items on which it is entitled to rely under Section 7.1, or (b) there is a "fundamental difference" as set forth in Section 7.2A, [McMillan] shall, within five (5) business days after becoming aware of (a) or (b) and before performing any further Work in connection therewith, notify the Trust and the Trust's Engineer in writing about the error or fundamental difference of the type referred to in (a) or (b) and the consequences of the error or fundamental difference. [McMillan] shall follow the Trust's directives and shall be entitled, if appropriate, to an equitable adjustment in the Contract Price. There shall be no adjustment in the Contract Time for such differing site conditions except that the Contract Time shall be increased to the extent a time extension is received under the Consent Order. If no such time extension is granted, the equitable adjustment shall compensate [McMillan] for reasonable acceleration costs necessary to overcome the delay caused by such error.

(Filing No. 14-2 at 14 § 7.2). "Fundamental difference" is defined in the contract as:

> Fundamental Difference – The term "fundamental difference" for purposes of this Contract shall mean only a difference that causes EPA, after it has approved the use of ERH for the DNAPL area and the ATT zone and issued an Amendment to the EAM and/or issued an Explanation of Significant Differences ("ESD") with respect to that change, to issue a subsequent ESD or an Amendment to the EAM that alters the conditions or obligations applicable to the DNAPL area or the ATT zone. In the event of such subsequent ESD or subsequent Amendment to the EAM, the Trustees will either provide an equitable adjustment reasonably acceptable to Contractor or terminate the Contractor for convenience.

*Id.* § 7.2A. The Contract also provides for situations in which there are differences in the site that are not classified as fundamental differences:

> Other Differing Site Conditions – If any physical condition uncovered or revealed at the Site differs from that anticipated by [McMillan], [McMillan] shall deal with the condition as appropriate, consistent with the requirements of EPA and the Trust, without any adjustment in the Contract Price or Contract Time, except (A) as provided in Section 7.2 or (b) if [McMillan] encounters either underground man-made concrete structures, underground storage tanks or encounters the presence of diesel fuel and/or oil at soil concentrations exceeding 5,000 mg/kg in the ERH

treatment area, [McMillan] shall be entitled to an equitable adjustment in the Contract Price.

*Id.* §7.3.

McMillan has requested the EPA to issue an Explanation of Significant Difference ("ESD") or an Amended EAM stating that there was a "fundamental difference" in the Site conditions so that it might be eligible for a price adjustment under the Contract (Filing No. 145-14 at 3 ¶ 13). On December 21, 2019, McMillan representative David Rountree ("Rountree") informed EPA project manager Matthew Ohl ("Ohl") about the need for the EPA's decision on this issue:

> Our contract with the Trust makes any change order for differing conditions (such as contaminant mass outside of the treatment volume) contingent on EPA approval that a "significant difference" exists. Naturally, this is an important issue for us, and as we move forward toward additional sampling, you should be aware that there are significant differences of opinion regarding the origin of the contaminants detected in P-1 and P-2.

(Filing No. 145-6 at 1).  Despite McMillan's request, the EPA did not issue an ESD. On October 2, 2020, Rountree emailed Ohl again about the need for a finding of significant differences (Filing No. 145-7). On October 6, 2020, Ohl informed Rountree that an "ESD would not be issued" for Third Site but that, "if necessary, changes to the work would be documented in another Amended [EAM]." (Filing No. 145-8.)  On October 20, 2020, McMillan formally requested that the EPA "issue an Amended [EAM] that alters the conditions or obligations applicable to the site DNAPL area, in accordance with [McMillan's] contract with [the Trust], so that it will be compensated for costs incurred due to the fundamental changes in known conditions…." (Filing No. 145-21 at 1). Despite McMillan's request, the EPA did not issue an Amended EAM. The EPA has not issued an Amended EAM, an ESD, or approved any alternate remediation remedy for Third Site (Filing No. Filing No. 145-14 at ¶¶ 17, 18).

### 3.   The Trust declares McMillan's Work Defective

In November 2019, the Trust informed McMillan that McMillan's Work was defective

because it had repeatedly failed to achieve the required 90% reduction in VOCs in groundwater

(Filing No. 145-15). The Contract defines "Defective" as:

> 18.1.10 Defective – An adjective which when modifying or referring to the word
> Work refers to Work that is faulty, deficient, does not conform to the Contract
> Documents, does not meet the requirements of any sound engineering standard,
> practice or test, does not operate as planned, is not fit for the intended purpose, or
> does not receive an approval referred to in the Contract.

(Filing No. 14-2 at 29 § 18.1.10). The Contract defines "Work" as "the accomplishment of the

items to be performed by the Contractor as set forth in the Contract Documents." *Id.* at 31 §

18.1.28.

Because the Trust declared McMillan's work as defective, it directed McMillan to submit

a sampling plan to determine the location and concentration of the un-remediated VOCs (Filing

No. 145-14 at 2 ¶ 6; Filing No. 145-15). McMillan submitted three sampling plans to the Trust,

the last of which was also sent to the EPA (Filing No. 145-17; Filing No. 145-18; Filing No. 145-

19). The Trust rejected all the sampling plans for various deficiencies proposed in each plan (Filing

No. 145-14 at 3 ¶ 10). Despite the lack of an approved sampling plan, McMillan restarted ERH

operations without permission. *Id.* ¶ 11. The Trust never directed or authorized McMillan to restart

ERH operations. *Id.* at 2 ¶ 7. The Trust demanded that McMillan turn off the ERH system

immediately. *Id.* at 3 ¶ 12; (Filing No. 145-20 at 5).

In December 2020, the EPA confirmed that further treatment of Third Site was necessary

to achieve the required 90% reduction of VOCs in groundwater in the Third Site DNAPL area

(Filing No. 14-3). On June 1, 2021, following multiple unsuccessful attempts by McMillan to

remediate Third Site, the Trust provided a written notice of default termination to McMillan

pursuant to Section 14.2 of the Contract, in a letter titled "Notice of Default Termination and

Demand for Payment from McMillian-McGee Corporation and from The Guarantee Company on its Performance Bond Number: ES1199715" ("Termination Letter") (Filing No. 14-6). The Termination Letter provided the reason for termination, the Trust's payments to McMillan, the environmental consulting fees paid to remedy McMillan's default, projected future costs, and demand for payment. *Id.* McMillan responded by filing this action against the Trust (Filing No. 1).

**B.   Procedural Background**

On July 8, 2021, McMillan initiated this lawsuit asserting claims of breach of contract, conversion, unjust enrichment, and immediate possession (Filing No. 1). The Trust answered McMillan's Complaint and asserted Counterclaims against McMillan for fraud, breach of contract, negligence, environmental legal action, and cost recovery under The Comprehensive Environmental Response, Compensation, and Liability Act *(*"CERCLA") Section 107 (Filing No. 23 at 39-57).

On July 23, 2021, McMillan filed a Petition for Immediate Possession of Personal Property which sought to recover the ERH equipment at Third Site (Filing No. 7). On September 29, 2021, Magistrate Judge Mark Dinsmore issued a Report and Recommendation recommending that McMillan's motion be denied because it had not established that the Trust unlawfully possessed or detained the ERH equipment under Ind. Code. § 32-35-2 (Filing No. 32). McMillan objected to the Magistrate Judge's Report and Recommendation contending that the Contract between the parties conferred no right of possession to the Trust (Filing No. 36 at 4-12). On March 4, 2022, the Court overruled McMillan's objection and adopted the recommendations set forth in the Magistrate Judge's Report and Recommendation (Filing No. 53). McMillan's Petition for Immediate Possession of Property (Filing No. 7) was ultimately denied (Filing No. 53).

8

## II.    SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion

for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The fact the parties have filed cross-motions for summary judgment does not alter the standard set forth in Federal Rule of Civil Procedure 56(c)(2). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. With cross motions, the court is required to "construe all inferences in favor of the party against whom the motion under consideration is made." *Metro Life Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002).

### III.   DISCUSSION

McMillan's Complaint asserts four claims against the Trust. Count I: Breach of Contract/Fundamental Change, Count II: Conversion, Count III: Unjust Enrichment, and Count IV: Immediate Possession Pursuant to I.C. §32-35-2-1 *et. seq*. (Filing No. 1 at 10-12). The Trust asserts Counterclaims of Count I: Fraud, Counts II and III: Breach of Contract, Count IV: Negligence, Count V: Environmental Legal Action, and Count VI: Cost Recovery Under CERCLA Section 107. (Filing No. 23 at 46-57.) On May 7, 2023, the Trust filed a motion for summary judgment against McMillan (Filing No. 144), and McMillan responded in opposition and asserted a cross-motion for summary judgment (Filing No. 154). The Trust replied in support of its summary judgment motion and in opposition to McMillan's cross-motion (Filing No. 160). McMillan then filed its reply in support of its motion for summary judgment (Filing No. 162). The Court will begin its discussion with the motions concerning breach of contract.

A.    **Breach of Contract**

Both parties have moved for summary judgment in their respective favors on Count I of McMillan's Complaint, alleging the Trust's breach of contract, and Count II of the Trust's Counterclaims, alleging McMillan's breach of contract. The Court will address each party's motion for summary judgment as to Count I of McMillan's Complaint, and then their cross-motions for summary judgment as to Count II of the Trust's Counterclaims.

1.    **Count I of McMillan's Complaint**

Count I of the Complaint alleges that the Trust breached the Contract "by failing to properly delineate the Site in the first instance" and "frustrated the Contract by refusing to allow [McMillan] to address the contamination outside the DNAPL Area" (Filing No. 1 at 10). Count I also alleges that the newly discovered "contaminant mass" below the remediation area constitutes a fundamental change to the Contract under Section 7.2. *Id.* Both parties move for summary judgment as to Count I. The Court will address the Trust's motion first since it is dispositive of both motions.

a.    **Trust's Motion for Summary Judgment on Count I**

The Trust argues that McMillan's breach of contract claim fails because McMillan cannot show damages. Specifically, the Trust argues that McMillan's sole remedy under the Contract is an increase in the Contract price, to which McMillan is not entitled (Filing No. 145 at 24–30). McMillan does not respond to any of these arguments in its briefing. It is well established that when a party fails to respond to an issue raised in a summary judgment motion, the issue or claim is deemed abandoned or waived. *Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003); *Laborers' Int'l Union v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999); *see also United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) ("[P]erfunctory and undeveloped arguments . . . are

waived."). McMillan has therefore waived any response, and the Court treats the Trust's arguments as undisputed.

McMillan agreed to perform all work under the Contract for a fixed price (the "Contract Price") (Filing No. 14-2 at 5). Section 10.2 of the Contract provides that McMillan's "*sole remedy in case of any dispute* shall be an increase in the Contract Price to the extent allowed by the Contract Documents." (Filing No. 14-2 at 20 (emphases added).) Articles 3 and 7, in turn, identify the circumstances in which the Contract Price may be increased.

Section 3.1 provides that the Contract Price may be adjusted "pursuant to a Work Directive Change Order or a Contract Amendment" (Filing No. 14-2 at 5–6). Section 7.2 further provides that the Contract Price may be increased if: "(a) there is an error in the items on which [McMillan] is entitled to rely under Section 7.1, or (b) there is a 'fundamental difference' as set forth in Section 7.2A" (Filing No. 14-2 at 14). Section 7.1 permits McMillan to rely on:

> (a) . . . the accuracy but not the completeness of the technical data and dimensions that are contained in drawings prepared by Environ or Ramboll Environ (except that depth of treatment shall be to forty (40) feet), (b) the information regarding Grain Size Distribution and Additional Soil Data provided to the Contractor in an e-mail from the Trust dated March 11, 2016, and (c) the Technical Memorandum provided by Ramboll Environ as to Soil Resistivity Testing and other matters (except as to any assumed depth of treatment) dated April 5, 2016.

*Id.* at 13. And Section 7.2A defines "fundamental difference" as "only a difference that causes EPA . . . to issue a subsequent [ESD] of an Amendment to the EAM that alters the conditions or obligations applicable to the DNAPL area or the ATT zone." *Id.* at 14.

Additionally, Section 7.3 provides:

> If any physical condition uncovered or revealed at the Site differs from that anticipated by the Contract, the Contractor shall deal with the condition as appropriate . . . *without any adjustment in the Contract Price* or Contract Time, *except* (a) as provided in Section 7.2, or (b) if the Contractor encounters either underground man-made concrete structures, underground storage tanks or encounters the presence of diesel fuel and/or oil at soil concentrations exceeding

5,000 mg/kg in the ERH treatment area, Contractor shall be entitled to an equable adjustment in the Contract Price.

*Id.* at 14 (emphases added).

McMillan does not contend that the parties executed a Work Directive Change Order or a Contract Amendment ([Filing No. 1](#)), so no adjustment is warranted under Section 3.1. McMillan also does not allege any error in the information described in Section 7.1. Instead, the new information forming the basis for McMillan's claim is the discovery of contaminants below the forty-foot treatment depth, and that information is expressly excluded from Section 7.1 ([Filing No. 14-2 at 13](#) ("(except that depth of treatment shall be to forty (40) feet) . . . (except as to any assumed depth of treatment)")).  Further, McMillan does not allege that it encountered an underground man-made concrete structure, underground storage tank, or diesel fuel or oil, so a price adjustment is not warranted under Section 7.3, either.

The only remaining grounds for a Contract Price adjustment is a "fundamental difference" under Section 7.2. The Trust argues that McMillan has not shown a "fundamental difference" as defined by Section 7.2A. The Trust designates undisputed evidence that "[t]he EPA has never issued such an Amended EAM or ESD, despite repeated requests from McMillan" ([Filing No. 145 at 26](#)–28). Absent any dispute from McMillan, the Court agrees with the Trust that McMillan cannot show it is entitled to an adjustment in the Contract Price, which, pursuant to Section 10.2, is McMillan's sole remedy for breach of contract.

The Trust further argues that several Contract provisions preclude McMillan from recovering the specific damages alleged in the Complaint (none of which is a Contract Price adjustment) ([Filing No. 1 at 12](#)–13, ¶ 125). First, Section 2.2 states:

The Trust shall have no liability for delay damages or any other damages, costs, expenses, fines, penalties or other charges suffered or incurred by the Contractor or any person . . . claiming by or through the Contractor for any reasons, thing or cause whatsoever other than unreasonable and unjustified interference, whether by action

or inaction, by the Trust or the Trust's Engineer with the Work of the Contractor, except that Contractor shall be entitled to the costs of out of pocket acceleration to the extent that such costs (if any) are necessarily incurred by Contractor to overcome unreasonable delay by Trust or the Trust's Engineer in reviewing documents.

(Filing No. 14-2 at 4 § 2.2). As the Trust argues, McMillan has not alleged any unreasonable or unjustified interference by the Trust or its Engineer, or any unreasonable delay "in reviewing documents." *Id.*

Next, Section 3.1 provides:

…. In no event shall the Trust be obligated to pay any additional cost, expense, charge or other amount in connection with the performance of the Work, it being fully understood and agreed that the Contract Price [plus a bonus, if applicable] and any adjustment in Contract Price pursuant to a Work Directive Change Order or any Contract Amendment, is the sole amount payable by the Trust for the Work under the Contract Documents.

*Id.* at 6 § 3.1.  Most, if not all, of the damages alleged in the Complaint were incurred "in connection with" McMillan's work under the Contract and are therefore precluded under Section 3.1.

Last, Section 6.2 states:

Nothing in the Contract Documents shall create any contractual relationship between the Trust and any such Subcontractor . . . nor shall the Contract Documents or any terms thereof create any obligation on the part of the Trust to pay or to see to the payment or be in any way responsible for the payment of any monies due any such Subcontractor.

*Id.* at 12 § 6.2. The Court agrees with the Trust that Section 6.2 precludes McMillan from recovering any amounts allegedly owed to its subcontractors.

Though Section 10.2 is dispositive of McMillan's breach of contract claim, the Court agrees with the Trust that Sections 2.2, 3.1, and 6.2 also preclude McMillan from recovering its alleged damages. For all the above reasons, and absent any opposition from McMillan, the Trust has shown

it is entitled to judgment as a matter of law on McMillan's claim for breach of contract. The Trust's motion for summary judgment as to Count I of the Complaint is **granted**.

### b.   McMillan's Motion for Summary Judgment on Count I

In its cross-motion for summary judgment, McMillan moves for summary judgment "on its claims" against the Trust, which assumedly includes Count I.  However, McMillan's briefs fail to offer any argument as to why the Court should grant summary judgment in its favor on Count I.  Instead, McMillan focuses entirely on why the Court should deny the Trust's motion for summary judgment as to Count II of its Counterclaims.  Given this lack of support, and because the Court finds that the Trust is entitled to summary judgment on Count I, McMillan's motion for summary judgment as to Count I is **denied**.

### 2.   Count II of the Trust's Counterclaims

In Count II of its Counterclaims, the Trust alleges that McMillan breached several provisions of the Contract related to its cleanup objectives (Filing No. 77 at 54–55). The Trust moves for partial summary judgment on Count II as to liability only. In its combined response and cross-motion, McMillan argues that ambiguities in the Contract preclude summary judgment in favor of the Trust and that Count II must fail under various affirmative defenses.  The Court will again address the Trust's motion first.

### a.   Trust's Motion for Partial Summary Judgment on Count II

In its Counterclaims, the Trust alleges that McMillan breached the contract by providing "defective" work.  The Trust argues that McMillan provided defective work in four ways: (1) failing to design a system to achieve the required ninety percent VOC reduction; (2) failing to achieve the required ninety percent VOC reduction; (3) "secretly reenergizing its high voltage systems and operating it for months" without telling the EPA or the Trust; and (4) failing to secure approval from the EPA that the Contract work was complete (Filing No. 145 at 31). In response,

McMillan argues that the Contract is ambiguous as to the meaning of "VOC" and as to how the percentage reduction benchmark would be measured, and those ambiguities preclude summary judgment. McMillan also argues that the Trust's counterclaim must fail under the doctrines of impossibility, prevention of performance, and mutual mistake. The Court will discuss whether the Trust has shown that McMillan breached the Contract before discussing McMillan's affirmative defenses.

### i.     <u>McMillan's Breach of the Contract</u>

The Court will focus only on the Trust's second argument—that McMillan performed "defective" work, and thus breached the Contract, by failing to achieve the ninety percent VOC reduction—because that argument is again dispositive of both parties' cross-motions.[2] The Contract provides that McMillan "shall perform and complete on time the Work provided for in this Contract at Third Site," which includes:

> the design, installation, operation and maintenance of an ERH system at Third Site to achieve a reduction in the concentration of total volatile organic compounds ("VOCs") in groundwater in the Third Site DNAPL area to a depth of forty (40) feet . . . by greater than 90% at both locations.

(Filing No. 14-2 at 1 § 1.1.1). The Contract defines "defective" work as work that is "faulty, deficient, does not conform to the Contract Documents, does not meet the requirements of any sound engineering standard, practice or test, does not operate as planned, is not fit for the intended purpose, or does not receive an approval referred to in the Contract Documents." *Id.* at 29 § 18.1.10.

---

[2] Because the Court declines to address the Trust's argument that McMillan breached the Contract by failing to secure approval from the EPA that the Contract work was complete, the Court need not reach McMillan's unconscionability arguments (Filing No. 155 at 29).

The fact that McMillan failed to achieve at least a ninety percent reduction of VOCs prior to termination of the Contract is not genuinely disputed. McMillan conducted its first round of remediation operations between September 2018 and January 2019 (Filing No. 145 at 6; Filing No. 155 at 9). McMillan stopped this first round of operations because, according to McMillan, "internal testing" from January 2019 showed that it had achieved the required ninety percent reduction.  McMillan cites two documents that purportedly show the results of McMillan's internal testing. The first is an expert report from Dr. Kent S. Udell ("Dr. Udell") (Filing No. 156-7). Dr. Udell's report is inadmissible because it is unsigned and unsworn, and Dr. Udell's statement as to the January 2019 testing is inadmissible hearsay. Second, McMillan cites an April 2019 progress report, which only clarifies that McMillan's so-called "internal testing" did not consist of actual testing or groundwater sampling, but was instead a "determination . . . based on contaminant mass recovery trends, heated volume temperatures, and [McMillan's] assessment of treatment area groundwater conditions" (Filing No. 156-15 at 6; *see* Filing No. 156-14 at 6). Neither of these documents supports the assertion that McMillan conducted testing that showed at least a ninety percent reduction of VOCs at the DNAPL area. Moreover, testing was expressly precluded from McMillan's duties under the Contract (Filing No. 14-2 at 2).

In March 2019, the Trust's environmental consultant, Ramboll, conducted independent testing that showed that McMillan had not achieved a ninety percent reduction in total VOCs (Filing No. 145 at 6–7; Filing No. 14-4). McMillan does not dispute that the March 2019 Ramboll testing results showed contamination levels above the contractual limit (Filing No. 155 at 9).

McMillan conducted a second round of remediation operations from April to August 2019, again stopping once it believed it had achieved the Contract's cleanup objectives (Filing No. 145 at 7–8; Filing No. 155 at 9–10). McMillan asserts that "internal testing" in late June 2019 showed

that McMillan had achieved at least a ninety percent reduction in contamination in the DNAPL area, but McMillan again fails to support this assertion with admissible evidence. McMillan cites only the expert report of Dr. Udell, which is inadmissible for the reasons previously described. Independent testing by Ramboll in September 2019 showed that McMillan had not met the Contract's cleanup objectives (Filing No. 145 at 8; Filing No. 14-5), and McMillan does not dispute that these testing results showed contamination levels above the contractual limit[3] (Filing No. 155 at 9).

In November 2019, more than three years after the parties entered into the Contract, the Trust sent a letter to McMillan stating that its work had been "defective" under the Contract (Filing No. 145 at 9). McMillan responded by explaining that it believed a "contaminant mass" below the remediation area was causing recontamination. (Filing No. 145-2). McMillan claimed that it should receive an adjustment to the Contract Price based on these purported site conditions because "Clauses 7.1 and 7.2 of the Contract stipulate that where site conditions differ from what was distributed in the Invitation to Prequalify for the Contract, there may be an adjustment to the Contract Price (Filing No. 145 at 10). McMillan submitted additional sampling plans to the Trust, but the Trust rejected them due to various deficiencies. *Id.* at 11. The parties engaged in subsequent negotiations about McMillan's continued work under the Contract, but those negotiations were unsuccessful. *Id.*

In June 2021, the Trust provided written notice of McMillan's default termination under Section 14.2 of the Contract (Filing No. 14-6). Section 14.2 permits termination of the Contract if the "Contractor repeatedly fails to perform the Work in accordance with the Contract Documents,"

---

[3] McMillan contends that the September 2019 testing samples were taken from below forty feet, citing portions of the Trust's Second Amended Answer (Filing No. 155 at 10). However, those Answers refer to July and August 2020 testing, not September 2019 testing, which was performed within forty feet (Filing No. 23 at 20; Filing No. 160 at 13).

among other reasons (Filing No. 14-2 at 25 § 14.2(f)). McMillan initiated this action the following

month. In November and December 2022, as part of discovery during this litigation, additional

testing of the Site was conducted (Filing No. 155 at 13; Filing No. 160 at 30).

The undisputed material facts show that the Trust is entitled to judgment as a matter of law

on its breach of contract counterclaim. The March and September 2019 testing by Ramboll shows

that McMillan failed to "achieve a reduction in the concentration of total volatile organic

compounds … in groundwater in the Third Site DNAPL area to a depth of forty (40) feet … by

greater than 90%" as required under the Contract. McMillan does not offer any admissible

evidence genuinely disputing its failure to achieve the Contract's cleanup objectives. McMillan's

allegations about the results of "internal testing" are unsupported by admissible evidence.

Additionally, the November and December 2022 testing conducted during discovery does not

create a genuine dispute of material fact, since that testing occurred well after termination of the

Contract. McMillan offers no authority whatsoever supporting the position that post-termination

performance can cure a breach of contract.[4]

McMillan further argues that two ambiguities in the Contract preclude summary judgment.

A contract term is ambiguous if it is susceptible to more than one reasonable interpretation. *See,*

*e.g.*, *Erie Indem. Co. for Subscribers at Erie Ins. Exchange v. Estate of Harris*, 99 N.E.3d 625, 630

(Ind. 2018). First, McMillan argues that the term "VOC" is ambiguous because it could reasonably

be read to either include or exclude Dichlorobenzene (Filing No. 155 at 11–12). Second, McMillan

argues that the Contract is ambiguous as to the method by which the parties should determine VOC

reduction. McMillan contends that VOC reduction could be measured in two ways: by looking at

---

[4] For this same reason, the Court disagrees with McMillan that "any ruling as to summary judgment is premature pending a renewed application for approval to the EPA" based on these post-termination test results.

the level of VOCs in each sampled well individually, as the Trust proposes; or by taking the "sum" of the wells, which according to McMillan means "that an average would be taken across all wells to determine the overall level of reduction for each" (Filing No. 155 at 12–13).[5] However, the Court need not decide whether either of these Contract terms are ambiguous because neither ambiguity is material. Stated differently, even after adopting McMillan's definition of "VOCs" and its averaging method for measuring VOC reduction, there would still be no set of facts under which a reasonable jury could find in McMillan's favor.

The only admissible tests of chemical reduction conducted prior to Contract termination are Ramboll's March and September 2019 tests. After removing Dichlorobenzene from those results and averaging the remaining totals across all three sampling wells, the remaining chemical concentrations well exceeded the Contract's goal of 4,285 ug/L (Filing No. 160 at 21–22 (explaining calculations)).[6] McMillan does not dispute the accuracy of the Trust's calculations based on the March and September 2019 tests. Because the resolution of both alleged ambiguities in McMillan's favor would still not entitle McMillan to a favorable judgment, neither ambiguity is material, and neither precludes summary judgment.

The undisputed material facts show that McMillan breached the contract by failing to achieve the required ninety percent reduction of VOCs from the DNAPL area. Unless McMillan's

---

[5] Even though the Court need not decide whether "sum" is ambiguous, the Court notes that McMillan's argument that "sum" means "average" is wholly unsupported by any authority and is contrary to the plain meaning of both terms. *Compare Sum*, Merriam-Webster Dictionary ("the result of adding numbers") *with Average*, Merriam-Webster Dictionary ("an estimation of or approximation to an arithmetic mean"). Even the Design Report itself, on which McMillan relies, explains that the testing results for "each" of the three wells should be "summed," not that the sum total for all three wells should be averaged. The Design Report even uses the term "average" in the next sentence, showing that the parties understood the difference between "sum" and "average" (Filing No. 23-2 at 20).

[6] Even when averaging all three wells plus the Sump, the Court's conclusion remains unchanged.

March 2019 COCs: 1,436 + 23,513 + 2,739 + 170 = 27,858 ug/L ÷ 4 = 6,964.5 ug/L.
September 2019 COCs: 528 + 20,748 + 1,143 + 76 = 22,495 ug/L ÷ 4 = 5,623.75 ug/L.

affirmative defenses of impossibility, prevention of performance, or mutual mistake excuse this breach, the Trust is entitled to summary judgment on Count II as to the issue of liability.

### ii.   **Impossibility**

McMillan argues that its breach is excused under the doctrine of impossibility. "Legal impossibility is an affirmative defense that the invoking party has the burden to establish." *Drenter v. Duitz*, 883 N.E.2d 1194, 1201 (Ind. Ct. App. 2008) (citation omitted). McMillan contends that under Indiana law, nonperformance should be excused if performance has been made "impossible or uneconomical," citing *Northern Indiana Public Services Co. v. Carbon County Coal Co.*, 799 F.2d 265, 276–78 (7th Cir. 1986). (Filing No. 155 at 25). However, in *Carbon County Coal*, the Seventh Circuit did not explicitly apply Indiana law, and, more generally, McMillan's contention that impossibility occurs whenever performance has been made "uneconomical" reads the doctrine of impossibility too broadly. The Indiana Court of Appeals has stated that "impossible" does not mean "difficult or relatively impossible, but absolutely impossible, owing to the act of God, the act of the law, or the loss or destruction of the subject-matter of the contract." *Wagler v. W. Boggs Sewer Dist.*, 980 N.E.2d 363, 378 (Ind. Ct. App. 2012).

McMillan asserts that performance under the Contract is impossible because the Trust is now requiring McMillan to remediate the Site beyond forty feet, which "could risk further enforcement action being taken against the parties by the EPA" (Filing No. 155 at 25–26). McMillan's argument is unpersuasive for four reasons. First, McMillan's argument about cleanup beyond the scope of the Contract is inapposite. The focus of the Court's impossibility inquiry is whether performance under the Contract is impossible, not whether performance beyond the Contract would be impossible (Filing No. 160 at 24). Second, McMillan fails to explain how additional contamination below forty feet or "risks" of EPA enforcement action makes performance "absolutely impossible," rather than simply difficult or expensive. Third, the

discovery of pre-existing contamination below forty feet cannot, as a matter of law, render performance impossible, since "the defense of impossibility does not apply to situations in which the condition that is causing the alleged impossibility existed at the time of agreement, which is the case here." *McConnell v. Doan*, 217 N.E.3d 1257, 1265 n.3 (Ind. Ct. App. 2023). And fourth, McMillan's impossibility argument is severely undercut by its contemporaneous argument that it has successfully performed under the contract (Filing No. 155 at 23 (claiming that McMillan has "not only met but exceeded" the Contract's requirements)). The Court concludes that McMillan's breach of Contract is not excused due to impossibility of performance.

### iii.   Prevention of Performance

McMillan next contends that its breach should be excused because the Trust prevented McMillan from performing. "[T]he common law of contracts excuses performance of one party where the other party wrongfully prevents that performance." *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 620 (Ind. Ct. App. 2000). Importantly, the prevention of performance must be "wrongful".  In other words, a breach is excused only "'where the lack of cooperation constitutes a breach, either of a duty imposed by the terms of the agreement itself or of a duty imposed by a term supplied by the court.'" *Acheron Med. Supply, LLC v. Cook Med. Inc.*, 958 F.3d 637, 646 (7th Cir. 2020) (applying Indiana law) (quoting Restatement (Second) of Contracts § 245). "'The doctrine of prevention as an excuse for non-performance of a contractual duty is inapplicable when the conduct alleged to have prevented performance was permissible under the express or the implied terms of the contract.'" *Id.* (quoting 13 Williston on Contracts § 39:11 (4th ed.)).

Under the Contract, if McMillan performs "defective" work, then McMillan must correct that work as directed by the Trust (Filing No. 14-2 at 23). In its November 2019 letter to McMillan, the Trust directed McMillan to submit a sampling plan for review by the Trust and the EPA before continuing its remediation work, which the Trust had contractual authority to do (Filing No. 145-

15). Later that same day, McMillan sent a response letter disagreeing with the Trust's claim of defective work and stating that although McMillan "would like to work with the Trust to remove any further contaminants from the Site, . . . this will need to be a negotiated process" (Filing No. 145-16 at 2). McMillan stated it "look[ed] forward to discussing . . . a mutually acceptable plan to remove any remaining contaminants at the site." *Id.* at 3.  The parties agree that these subsequent negotiations were ultimately unsuccessful (Filing No. 145 at 13–14; Filing No. 155 at 14).

These undisputed material facts show that the Trust did not "wrongfully" prevent McMillan from accessing the Site before terminating the Contract. There is no genuine dispute that McMillan's work prior to termination of the Contract was defective, that the Trust had contractual authority to direct the correction of that defective work, and that the parties engaged in negotiations about how McMillan would continue its work moving forward. These facts do not "present a scenario in which one party actively sought to sabotage the other party's performance to escape its own obligations or obtain an unfair advantage. Instead, the parties failed to come to an agreement" about how McMillan would correct its defective work. The failure to reach an agreement does not constitute wrongful prevention of performance under Indiana law.

### iv. <u>Mutual Mistake</u>

Lastly, McMillan argues that the Contract is unenforceable due to the parties' mutual mistake. McMillan contends that the parties were mutually mistaken "regarding the extent to which VOCs were present at the Site" (Filing No. 155). A party seeking to avoid a contract under the doctrine of mutual mistake must show that both parties were originally mistaken as to a fact that goes to the "essence of the agreement." *Ball v. Versar*, 454 F. Supp. 2d 783, 804 (S.D. Ind. 2006). In those circumstances, the contract is rendered unenforceable because "a meeting of the minds never occurred." *Id.* "Where both parties share a common assumption about a vital fact upon which they based their bargain, and that assumption is false, the transaction may be avoided if, because

of the mistake, a quite different exchange of values occurs from the exchange of values contemplated by the parties." *Jay Cnty. Rural Elec. Membership Corp. v. Wabash Valley Power Assoc., Inc.*, 692 N.E.2d 905, 912 (Ind.App.1998) (citations omitted).

The Trust responds that this case is analogous to *Ball*, and the doctrine of mutual mistake does not apply here for the same reasons as in *Ball*. The Court agrees with the Trust. *Ball* also involved a contract dispute between a trust and a remediation contractor, Versar, regarding cleanup of a hazardous waste site. *Ball*, 454 F. Supp. 2d at 786. Versar breached the contract by failing to achieve the contract's required cleanup objectives. *Id.* at 792. On summary judgment, Versar argued that its breach was excusable under the doctrine of mutual mistake. Specifically, it argued that the contract "was premised on a mutually mistaken belief that contamination was present in only shallow depth soil (not groundwater) and could be remedied by [Versar's chosen remediation] system." *Id.* at 803.

The *Ball* court found that "[t]he subsurface and hydrological characteristics of contamination at the . . . site were clearly material to Versar's agreement to perform remediation services there. Nevertheless, the plain language of the Contract allocates the risk of mistake about those conditions to Versar." *Id.* at 805. The contract in *Ball*, like the Contract here, provided that Versar assumed the risk of unknown conditions at the site (subject to certain inapplicable exclusions) and agreed to perform the work despite those conditions without any adjustment in the contract price or contract time. *Id.* at 805-06. The *Ball* court also noted that Versar had familiarized itself with the EPA Consent Decree for the site and either was or should have been aware of concerns about the contamination at the site. *Id.* at 806.

Mutual mistake does not excuse McMillan's breach for the same reasons. The Trust and McMillan anticipated the risk that conditions at the Site might be different than expected and

expressly allocated that risk to McMillan. In Section 4.1.2, McMillan represented that it had "obtained and carefully studied" all "examinations, investigations, explorations, tests, reports and studies which pertain to the surface or subsurface at or contiguous to the Site," and that McMillan "agree[d] to accept the conditions of the Site 'as is' and . . . assume[] all liability, risk and responsibility with respect thereto" (Filing No. 14-2 at 6-7 § 4.1.2). Section 7.1 repeats that McMillan "shall have full responsibility with respect to the physical conditions at or relating to the Site including surface, subsurface and other existing conditions." *Id.* at 13 § 7.1. Section 7.3 likewise provides that "[i]f any physical condition uncovered or revealed at the Site differs from that anticipated by the Contractor, the Contractor shall deal with the condition as appropriate . . . without any adjustment in the Contract Price or Contract Time." *Id.* at 14 § 7.3. Each of these provisions contains limited exceptions, found in Sections 7.1, 7.2, 7.2A, and 7.3, but as the Court previously explained, none of these exceptions applies.

Additionally, like the contractor in *Ball*, McMillan was aware of the risk of recontamination. Before entering into the Contract, the Trust and McMillan discussed the risk of McMillan accepting the Site "as is" (Filing No. 160 at 5-7). During these discussions, McMillan acknowledged that earlier sampling of the Site had extended to only thirty-five feet below ground level. *Id.* at 6. McMillan at one point stated that there were "too many data gaps" regarding the Site and that "the contract terms [were] unduly onerous to warrant [its] continued involvement in this project." *Id.* at 6. Further, in discovery responses, McMillan also acknowledge that it had experienced contaminant rebound in other projects. *Id.* at 7. This case is not one in which "one party experienced an unexpected, unbargained-for gain while the other party experienced an unexpected, unbargained-for loss." *Wilkin v. 1st Source Bank*, 548 N.E.2d 170, 172 (Ind.App.1990). The parties here explicitly acknowledged the risks of unknown Site conditions

and, following negotiations, agreed to allocate that risk to McMillan. Mutual mistake does not render the Contract unenforceable.

Because the undisputed material facts show that McMillan breached the Contract by failing to achieve the required ninety percent reduction of VOCs from the DNAPL area, and McMillan has failed to show that its breach should be excused, the Court **grants** the Trust's partial motion for summary judgment as to liability only on Count II of its Counterclaims.

### b.  McMillan's Motion for Summary Judgment

In its cross-motion, McMillan argues that the Trust's counterclaim for breach of contract fails under the doctrines of impossibility, prevention of performance, and mutual mistake. As the Court explains above, none of these arguments are successful. The undisputed evidence, even when drawing all reasonable inferences in favor of McMillan, shows that the Trust is entitled to judgment as a matter of law as to liability on its counterclaim for breach of contract. The Court therefore **denies** McMillan's motion for summary judgment on Count II of the Trust's Counterclaims.

### B.  Count II: Conversion

McMillan filed a claim for conversion pursuant to Indiana's crime victim's relief statute, Indiana Code § 34-24-3-1 (Filing No. 1 ¶ 108). McMillan alleges that Third Site is improperly withholding their equipment by failing to allow them to remove the equipment from Third Site and by improperly withholding the equipment without any contractual or other right to do so in violation of Indiana Code § 35-43-4-3. *Id.* ¶ 101; (*see* Filing No. 155 at 30-33).

Pursuant to Indiana statute, "[a] person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion." *JET Credit Union v. Loudermilk*, 879 N.E.2d 594, 597 (Ind. Ct. App. 2008) (citing Ind. Code § 35-43-4-3). "Any person who has suffered a pecuniary loss as a result of a criminal conversion may bring a civil action to

recover the loss." *Id.*  Unlike in a criminal trial, a plaintiff "need only prove by a preponderance of the evidence that the criminal act was committed by the defendant." *Squires v. Utility/Trailers of Indianapolis, Inc.*, 686 N.E.2d 416, 420 (Ind. Ct. App. 1997). To prove conversion, a plaintiff must show that: (1) the defendant's control over the property was unauthorized; and (2) the defendant was aware of a high probability that the control was unauthorized. *See Manzon v. Stant Corp.*, 138 F. Supp. 2d 1110, 1115 (S.D. Ind. 2001) (citations omitted).

The Trust argues McMillan fails to "establish the existence of an element essential to [their] case" because Magistrate Judge Dinsmore and this Court previously held that the Trust's possession of the ERH equipment was "contractually permissible" and not "unlawful." (Filing No. 145 at 17.)  In response, McMillan contends the doctrine of "law of the case" is inapplicable here and the Trust has no right to indefinitely possess its equipment when the Trust has no intention of permitting McMillan to perform further reparative work.

The purpose of the law of the case doctrine is to facilitate the finality of issues decided within the same action. *Lake Imaging, LLC v. Franciscan All., Inc.*, 225 N.E.3d 223, 230 (Ind. Ct. App. 2023). As this Court explained *in Rihm v. Ethicon, Inc.*:

> [t]he law of the case doctrine provides that "a ruling made in an earlier phase of a litigation controls the later phases unless a ***good reason*** is shown to depart from it." *Tice v. Am. Airlines, Inc.*, 373 F.3d 851, 853 (7th Cir. 2004); *see also HK Sys., Inc. v. Eaton Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009) ("The doctrine of law of the case counsels against a judge's changing an earlier ruling that he made in the same case . . . or that his predecessor as presiding judge had made.") (citations omitted). "Generally speaking, a successor judge should not reconsider the decision of a transferor judge at the same hierarchical level of the judiciary when a case is transferred." *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). The law of the case doctrine "authorizes such reconsideration if there is a ***compelling reason***, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 572 (7th Cir. 2006).

No. 19-cv-04545, 2020 WL 5248604, at *1 (S.D. Ind. Sept. 3, 2020) (emphasis added)).

McMillan argues the law of the case doctrine does not bar the Court from reconsidering Magistrate Judge Dinsmore's Report and Recommendation because the issue is now being ruled under a different standard. *See VDF FutureCeuticals, Inc. v. Lewis*, No. 1:13-cv-00407, 2014 U.S. Dist. LEXIS 86866, at *11 (N.D. Ill. June 25, 2014) (noting defendant could raise the same arguments raised in his motion to dismiss, in his motion for summary judgment, because the facts would be subjected to a different standard and therefore the law of the case regarding summary judgment had not been determined).

McMillan is correct that the law of the case doctrine does not strictly preclude reconsideration of a previous ruling, but the Court finds that the doctrine is nevertheless applicable here. *VDF FutureCeuticals, Inc.* is inapposite because the standard utilized when interpreting a contract at the motion for summary judgment stage is the same as the standard utilized in the Court's (should this say the Court's order on the Motion or should it say McMillan's) Motion for Immediate Possession of Personal Property. The goal of contract interpretation is to ascertain and enforce the parties' intent as manifested in their contract. *See Gregg v. Cooper*, 812 N.E.2d 210, 215 (Ind. Ct. App. 2004). This interpretation is a question of law, not a question of fact. *See In re Sw. Airlines Voucher Litig.*, 898 F.3d 740, 743 (7th Cir. 2018) ("[w]hen the facts are undisputed ..., contract interpretation is a legal question). The Court reads the contract as whole, construing language to give meaning to all the contract's words, terms, and phrases. *Nikish Software Corp. v. Manatron, Inc.*, 801 F. Supp. 2d 791, 800 (S.D. Ind. 2011). Neither party is entitled to special construction or favorable inferences on the language in the contract simply because the issue is now presented for summary judgment. *See id.* at 800-02.

McMillan has failed to prove that the Trust "knowingly or intentionally exert[ed] unauthorized control" over the ERH equipment. *See McKeighen v. Daviess Cnty. Fair. Bd.*, 918

N.E.2d 717, 723 (Ind. Ct. App. 2009). As this Court has previously held, the Trust's possession of the ERH equipment is "contractually permissible." (Filing No. 32 at 10-11; Filing No. 53 at 3). The Contract provides that removal of the ERH equipment is only permitted upon approval from the EPA. (*See* Filing No. 14-2 at 2 § 1.1.7) ("[a]fter EPA has agreed that [the cleanup objectives] have been met… [McMillan], may, if it wishes to do so, remove [the ERH equipment]."). Since the cleanup objectives have not been met, the Trust's possession of the ERH equipment is authorized by the Contract. The Trust's motion for summary judgment as to Count II of McMillan's Complaint is **granted**. Accordingly, McMillan's motion for summary judgment as to Count II is **denied**.

**C.   Count III: Unjust Enrichment**

In Count III, McMillan alleges Third Site has been unjustly enriched "by its failure to pay for work carried out by [McMillan] for the benefit of the Trust." (Filing No. 1 ¶ 110). In its motion for summary judgment, the Trust argues that McMillan's claim for unjust enrichment is improper because there is an express contract that governs the relationship between the parties.

Under Indiana law, a claim for unjust enrichment cannot be maintained where the relationship between the parties is governed by an express contract because: (1) contract provides remedy at law; and (2) plaintiff cannot pursue equitable remedy when there is remedy at law. *Ent. USA, Inc. v. Moorehead Commc'ns, Inc.*, 93 F. Supp. 3d 915, 934 (N.D. Ind. 2015); *see DiMizio v. Romo*, 756 N.E.2d 1018, 1025 (Ind. Ct. App. 2001) ("Unjust enrichment operates when there is no governing contract."); *see also Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, 665 F.3d 897, 905 (7th Cir. 2011) ("When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract.").

Here, McMillan incorporates by reference the material factual allegations contained in paragraphs 1-108 into their unjust enrichment claim (Filing No. 1 ¶ 109). In paragraphs 98 and

29

101, McMillan alleges that the Trust has "breached the Contract by failing to properly delineate the Site in the first instance….", *id.* ¶ 98, and "breached its obligations **under the Contract** by failing to allow [McMillan] to remove its equipment from the Site", *id.* ¶ 101 (emphasis added). McMillan also alleges that the Trust received a benefit from the services they provided following recontamination from April to August 2019, and again from November 2019 to January 2020. *Id.* ¶¶ 111-12. Because McMillan includes allegations of the breach of a specific contract and the services performed in 2019 and 2020 were not outside the scope of the Contract, the Trust is entitled to summary judgment on McMillan's unjust enrichment claim.

Furthermore, in its response brief, McMillan fails to advance any argument in support of its unjust enrichment claim. By failing to respond, McMillan has waived its claim. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *Williams v. Lovchik*, 830 F. Supp. 2d 604, 614 (S.D. Ind. 2011) ("By failing to [address Defendant's arguments], Plaintiff has waived these arguments and summary judgment must be entered with respect to these claims."). Accordingly, the Trust's motion for summary judgment as to Count III of McMillan's Complaint is **granted** and McMillan's motion for summary judgment as to Count III is **denied**.

## D.   <u>Count IV: Immediate Possession</u>

McMillan seeks immediate possession of the ERH equipment located at Third Site on the grounds that "there is no provision in the parties' agreement which permits the Trust to indefinitely possess [its] equipment". (Filing No. 155 at 33.) The Trust moves for summary judgment arguing McMillan has failed to show that the ERH equipment is being unlawfully detained, and the Court's previous ruling is the law of the case and should not be altered.

To recover in an action for replevin, a plaintiff must prove his title or right to possession; that the property is unlawfully detained; and that the defendant wrongfully holds possession. *United Farm Family Mut. Ins. Co. v. Michalski*, 814 N.E.2d 1060, 1066 (Ind. Ct. App. 2004).

30

McMillan has established, and the Trust does not dispute, its title to the property. (*See* Filing No. 16-1 at 1 ¶ 4) (affidavit submitted by Brent Winder, employee of McMillan, stating "[McMillan] is the owner of and lawfully entitled to the immediate possession of the [ERH equipment]."). But McMillan has failed to establish that the ERH equipment is being unlawfully detained or wrongfully possessed by the Trust.

This Court held that the Trust's "temporary possession [of McMillan's ERH equipment] is contractually permissible." (Filing No. 32 at 11.) For the reasons stated in Section III(A)(2) *supra*, this ruling is the law of the case. The Trust's possession of the ERH equipment is contractually permissible until it receives EPA approval that the Contract goals have been met or the EPA approves an alternate remediation strategy, such as bioremediation (*see* Filing No. 32 at 14). The Trust has not received EPA approval that the Contract goals have been met nor has the EPA approved the Trust to use bioremediation in place of ERH treatment (*see* Filing No. 14-3; Filing No. 43-1; Filing No. 14-1 at 3 ¶ 11). For these reasons alone, summary judgment should be granted in the Trust's favor on Count IV, but the Court finds it necessary to address McMillan's final argument.

McMillan argues "this Court cannot properly rule upon [McMillan's] claims for immediate possession and conversion until all pending contractual claims have been resolved, as the Trust's alleged right to detain [McMillan's] property is contingent upon the resolution of the parties' contract." (Filing No. 155 at 33.)  The Court has resolved all matters necessary to rule on McMillan's claim for immediate possession (*see* Section III(A) *supra*).  McMillan has breached the Contract by not achieving a 90% reduction of the VOCs.  Accordingly, the Court **grants** summary judgment in the Trust's favor on Count IV of McMillan's Complaint and McMillan's motion for summary judgment as to Count IV is **denied**.

## IV.     <u>CONCLUSION</u>

For the reasons discussed above, the Trust's Motion for Summary Judgment on all counts in McMillan's Complaint and for partial Summary Judgment against McMillan on Count II of the Trust's Counterclaim as to liability only (Filing No. 144) is **GRANTED**.  McMillan's Motion for Summary Judgment (Filing No. 154) is **DENIED**.  This case shall proceed on the Trust's counterclaims for Count I: Fraud, Counts II Breach of Contract as to damages only, Count III: Breach of Contract, Count IV: Negligence, Count V: Environmental Legal Action, and Count VI: Cost Recovery Under CERCLA Section 107.

**SO ORDERED.**

Date:  3/29/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Charles J. Maiers
DUE DOYLE FANNING & ALDERFER LLP
cmaiers@duedoyle.com

Christopher J. Appel
DUE DOYLE FANNING & ALDERFER LLP
cappel@duedoyle.com

Vincent P. Antaki
REMINGER CO. LPA (Indianapolis)
vantaki@reminger.com

Kevin Morris Toner
PLEWS SHADLEY RACHER & BRAUN LLP
ktoner@psrb.com

Ryan Taylor Leagre
PLEWS SHADLEY RACHER & BRAUN
rleagre@psrb.com

Brian Charles Padove
WATT TIEDER HOFFAR & FITZGERALD, LLP
bpadove@watttieder.com

John E. Sebastian
WATT TIEDER HOFFAR & FITZGERALD, LLP
jsebastian@watttieder.com